John H. LIVENS, Plaintiff,

v.

WILLIAM D. WITTER, INC., et al., Defendants.

Civ. A. No. 70–1040–G.

United States District Court, D. Massachusetts.

April 25, 1974.

Richard W. Renehan, Hill & Barlow, Boston, Mass., for plaintiff.

George C. Caner—Ropes & Gray, Boston, Mass., for defendant William D. Witter, Inc.

Daniel B. Bickford, Ely, Bartlett, Brown & Proctor, Boston, Mass., for defendants William D. Witter & Duane Wilder.

## MEMORANDUM OF DECISION

GARRITY, District Judge.

Plaintiff purchased unregistered securities costing $83,700 from defendants in a now bankrupt company, Leisure Planning Corporation (LPC) and claims that the securities were sold to him in violation of section 5 of the Securities Act of 1933, 15 U.S.C. § 77e. Plaintiff asserts liability under section 12 of the Act, 15 U.S.C. § 77*l*. Jurisdiction lies under 28 U.S.C. § 1331 and section 22 of the Act, 15 U.S.C. § 77v. Under pendent jurisdiction, plaintiff also alleges a violation of the Massachusetts Blue Sky Law, Mass.G.L. c. 110A, §§ 5 and 18.[1] The case was tried to the court without a jury. The parties filed a stipulation of undisputed facts, briefs and requests for findings and rulings.

Plaintiff's purchases were made on five dates between October 4, 1967 and December 19, 1968, all more than one year before suit was instituted on August 17, 1970. A one-year period of limitations is prescribed by section 13 of the Act, 15 U.S.C. § 77m. The complaint endeavors to avoid the statute of limitations in two ways: count I alleges that plaintiff's purchases were of parts of a single, integrated offering of LPC securities beginning in October, 1967 and extending until April, 1970; count II alleges that defendants are estopped from defending on the basis of the statute of limitations because of representations of fact on which plaintiff relied in forebearing from bringing suit earlier. Defendants pleaded the statute of limitations and also defended on the ground that the sales did not involve any public offering and hence were exempt under section 4(2) of the Act, 15 U.S.C. § 77d.

Regarding the cause of action under state law, count V of the complaint, a two-year statute of limitations is estab-lished by Mass.G.L. c. 110A, § 18. Plaintiff has endeavored to avoid it on the same bases of an integrated offering and estoppel. Defendants have relied on exemptions to the requirement of registration with the state department of public utilities (DPU) prescribed in Mass.G.L. c. 110A, § 3: the "isolated sale" exemption in subsection (a) with respect to the initial sale in October, 1967 and the exemption of sales by a corporation to its security holders contained in subsection (e) with respect to subsequent sales.

Plaintiff proved prima facie cases under both the federal and state causes of action. The securities were sold without registration statements having been filed with the federal and state regulatory agencies, the SEC or the DPU. The mails were used. The defendants were issuers within the meaning of section 2(4) of the Act, 15 U.S.C. § 77b(4) except that the corporate defendant was an issuer only of the securities sold in October, 1967. The corporate defendant was the underwriter of the first distribution of securities in October, 1967. Thereafter the corporate defendant played no role and the securities were issued by LPC, of which the individual defendants were controlling persons as well as solicitors of the sales. However, on all issues relating to the defenses of statutes of limitations and exemptions the court finds for the defendants and orders that judgment be entered for the defendants and the case be dismissed.

■ The keystone of plaintiff's case was his contention that the securities offered to him on six occasions between September, 1967 and April, 1970 (he declined to buy any from the last two offerings) were parts of a single program of financing to pay old bills and provide working capital for LPC and to fund acquisitions LPC was contemplating. The

---

1. The complaint also contained two counts based upon alleged misrepresentations in violation of section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) and Rule 10b–5 of the Securities Exchange Commission, 17 C.F.R. § 240.10b–5; but plaintiff dismissed these counts with prejudice at the outset of the trial.

dates and amounts of the four financings in which plaintiff participated and the dates and amounts of his purchases are as follows:

| Date of Financing | Total Amount Raised | Date Plaintiff's Purchase | Amount Plaintiff's Purchase |
|---|---|---|---|
| Oct. 1967 | $630,000 | Oct. 4, 1967 | $21,000 |
| Jan. 1968 | 448,000 | Jan. 15, 1968 | 19,200 |
| June 1968 | 750,000 | June 17, 1968 | 24,000 |
| Oct.-Dec. 1968 | 559,000 | Oct. 24, 1968 (as to 12,000) and Dec. 19, 1968 (as to 7500) | 19,500 |

The fifth financing occurred during January and February, 1969 and raised $838,500 through the sale of common stock; and the sixth from January to April, 1970 and raised $1,950,000 through the sale of convertible, subordinated debentures. Plaintiff's integration theory tracks SEC Interpretive Release No. 33–4552, Nov. 6, 1962, 17 C.F. R. § 231.4552. Although not yet applied by a court in the context of the availability of an exemption under section 4(2), see The Value Line Fund, Inc. v. Marcus, S.D.N.Y.1965, CCH Fed.Secur. L.Rep. ¶ 91,523, there is no reason why it should not be if the facts warrant, Bowers v. Columbia General Corporation, D.Del.1971, 336 F.Supp. 609, 624–625. In the instant case, some basis for integration appears in the facts that (a) for the most part the offerings were made for the same general purpose, and (b) the parties recognized that the first financing in October, 1967 might be inadequate and additional financing might be required. On the other hand, everyone hoped and expected that the initial $630,000 would be sufficient to enable LPC to operate profitably. It was felt that deposits by tourists reserving places on package tours sponsored by LPC, known as the "customer deposit float", would supplement its working capital sufficiently to enable it to prosper. Thereafter, each successive financing was expected by the defendants to be the last which would be required to make LPC self-supporting. A series of obstacles to profitability was encountered, many of them beyond the control of the company or the defendants who, incidentally, each invested $1,400,000 of their own funds. Specific acquisitions of subsidiaries and the charter of a cruise ship, MTS Orpheus, were not contemplated at the time of the first financing in October, 1967. The evidence simply did not show a single plan of financing. Moreover, the several offerings were not made at or about the same time, different classes of securities were issued and the prices of the securities varied. On balance, the integrated offering doctrine is clearly inapplicable.

The one year statute of limitations provided by section 13 of the Act, 15 U. S.C. § 77m, runs from the date of the violation, in this instance the date of the sale or use of the mails. Shuman v. Sherman, D.Md.1973, 356 F.Supp. 911, 913, Bryant v. Uland, S.D.Tex.1971, 327 F.Supp. 439, 446. Defendants' last sale to plaintiff was on December 19, 1968. Therefore, absent estoppel, plaintiff's federal remedy with respect to that alleged violation expired eight months before this suit was instituted. Regarding the initial sale to him on October 4, 1967, it expired nearly two years before suit was instituted.

■ Plaintiff's estoppel argument is practically frivolous. In plaintiff's pretrial memorandum on this point plaintiff asserted that he was induced to de-

lay in bringing suit by a series of misrepresentations. He cited two securities decisions, Katz v. Amos Treat & Co., 2 Cir.. 1969, 411 F.2d 1046, 1054–1055, and Moerman v. Zipco, Inc., E.D.N.Y.1969, 302 F.Supp. 439, both of which discussed estoppel on the basis of evidence of misrepresentations by defendants, invoking the ancient principle that no man can take advantage of his own wrong. The substance of plaintiff's estoppel theory virtually disappeared when he voluntarily dismissed counts III and IV, the fraud counts, at the beginning of the trial. Moreover, the proof showed not representations of fact but expressions of hope and belief that earnings would improve, that a prospective merger with another company might result in a public market for plaintiff's shares, that a proposed SEC rule, the so-called "Wheat rule" would free up all restricted stock, etc. At the trial plaintiff soft-pedaled his estoppel claim to the extent of never testifying explicitly that he relied on any statement made to him by any defendant in postponing commencement of suit.

The closest the defendants came to taking any affirmative action which might have lulled plaintiff into a false sense of security occurred in April 1970, after the statute of limitations had already run. On February 10, 1970 following up a telephone call on the previous day, plaintiff wrote a letter to the defendant Witter alleging mismanagement and dissemination of misleading information by the defendants and demanding that they assist him in selling his stock. Plaintiff offered his shares to Mr. Witter for $110,000. In March 1970, by telephone, plaintiff threatened to take some action if Witter did not purchase his shares. Witter asked plaintiff not to do anything rash and told him that he would try to find someone to buy him out. On April 2, 1970

Witter, on behalf of himself and Wilder, offered to purchase plaintiff's shares at $1.67 per share. Plaintiff replied that the price was too low. About a month later plaintiff sought indirectly[2] to revive the negotiations, but Witter's position was that his best offer had not been accepted by the plaintiff and was no longer open. At no time did any defendant make a commitment or promise to the plaintiff to purchase his shares.

With respect to the cause of action based on the state Blue Sky Law, a two year statute of limitations under Mass.G.L. c. 110A, § 18, applies. This statute bars plaintiff's claims based upon his purchases from the first three LPC financings, but not those totalling $19,500 based upon plaintiff's purchases on October 24 and December 19, 1968 from the fourth LPC financing. On the merits, however, the plain language of § 3(e) of the same chapter nullifies those claims. It exempts "the sale by a corporation of its securities to and among its security holders or their assigns." The fourth financing involved the sale by LPC of its common stock at $1.67 per share. For more than a year, since the fall of 1967, plaintiff had been a holder of the securities of LPC. Therefore the provisions of § 5 did not require the filing with the DPU of a notice of intention to sell and a statement of prescribed, relevant information.

Although the court's rulings thus far are dispositive of plaintiff's claims, we shall, in the interest of judicial economy, proceed to discuss other defenses which were tried and which we believe were valid, viz., the non-public offering exemption under 15 U.S.C. § 77d(2) and the isolated sale exemption under Mass. G.L. c. 110A, § 3(a). What constitutes a non-public offering is not set forth in the Act, nor has it been defined specifically in the cases. However, the determinative factors have been identified

2. In telephone calls during May and June 1970 to a salesman, Shipman, and the chairman of the board, Balog, of William D. Witter, Inc., plaintiff tried unsuccessfully to bring pressure to bear upon Witter and to use the business relationship between the Witter firm and his own to minimize his prospective losses. LPC filed for bankruptcy on July 22, 1970 and was adjudicated a bankrupt in August, 1970.

and discussed and various general rules of decision have evolved in several cases. The landmark case is Securities & Exchange Commission v. Ralston Purina Co., 1953, 346 U.S. 119, 73 S.Ct. 981, 97 L.Ed. 1494. The law on non-public offerings is treated comprehensively in S. E.C. v. Continental Tobacco Co. of S.C., 5 Cir. 1972, 463 F.2d 137, 154–161, and Hill York Corporation v. American International Franchises, Inc., 5 Cir. 1971, 448 F.2d 680, 686–695, and in 1 Loss, Securities Regulation (2d ed. 1961) 653–689, and in an annotation, What Constitutes a "Public Offering", 6 A.L. R.Fed. 536–577, and 69 Am.Jur.2d, Securities Regulation-Federal §§ 102–106. No purpose would be served by our endeavoring to restate all the applicable law. We shall go directly to what we understand to be the controlling considerations.

Defendants presented the complete factual picture. Their proof was not confined to plaintiff's need for the protection of the disclosure requirements of the Act, plaintiff's intent, relationship to the defendants, ability to fend for himself and so forth, but rather extended to all offerees of each separate financing. LPC was in the domestic and international travel business, selling packaged tours to individuals and groups. When the individual defendants first became interested in putting together a group of investors who would acquire the business, it was named Male Travel Bureau, Inc. after its president Roy R. Male. After the acquisition the name was changed to MTB Corporation and in January, 1969 to Leisure Planning Corporation (LPC). The purpose of the first financing was to obtain control of the corporation and to supply sufficient working capital to operate the business profitably. The defendants consulted counsel, who advised that the securities issued in the first financing would be exempt from registration under the Act if sold to a group of not more than twenty knowledgeable investors who were familiar with the Company's affairs. Actually the number of offerees was twenty-three, but the number of investors was held to twenty. A twenty-first participated in the second financing, the same number and same persons in the third financing. Thirty, including the original twenty, participated in the fourth financing. Many of the investors were personal friends of the individual defendants, such as college and graduate school roommates, and all were experienced businessmen and investors. Plaintiff did not know Wilder, who had been employed by McDonnell & Co., and was only a business acquaintance of Witter's. Since 1964 plaintiff had been employed as an investment analyst for State Street Research and Management Company, a partnership which at all material times served as investment adviser for three mutual funds with assets totalling about a half billion dollars and also for various private accounts, including the Harvard University Endowment Fund whose assets were over a billion. Plaintiff concentrated on investment opportunities in the elctronics and aerospace industries. In June, 1968, at about the time of the third LPC financing, plaintiff became one of twelve partners in the firm. William D. Witter, Inc. was a New York Stock Exchange brokerage firm specializing in handling institutional accounts and supplying them with investment research. Witter's salesman called upon plaintiff in Boston and he occasionally visited the Witter, Inc., offices in New York. A Witter, Inc. vice-president, Skelton, first broached to plaintiff the subject of investing in LPC and, before deciding to do so, plaintiff had conversations with the defendant Witter and another prospective investor, Sarlo. Plaintiff had graduated from the Harvard Business School and, in the fall of 1967, had an active personal portfolio which he managed, including securities in a dozen different companies. Although he had no previous experience in owning restricted or so-called letter shares, he knew that he was buying letter securities and understood the significance of the restrictions on their transferability. Before making his first purchase of

LPC securities, plaintiff was informed specifically that (a) the securities were highly speculative, (b) they were issued for investment by sophisticated investors, (c) existing financial records of LPC were incomplete and unreliable, and (d) additional financing might be required in the months ahead. Before deciding to make subsequent purchases, he received several reports describing LPC's operations and difficulties, discussed its problems many times with both individual defendants and with officers of LPC, visited the company's offices and attended a shareholders' meeting. Defendants kept plaintiff well informed about the operating and financial condition of LPC. At no time did any defendant misrepresent any facts to him or conceal any material facts from him.

Plaintiff and all other offerees of LPC securities purchased them intending to hold them for investment. Their long-range plan was for LPC to "go public" after profitable operations were established, at which time there would presumably be a market for their shares with or without restrictions. After plaintiff's purchase of securities from the fourth financing, he decided to sell if he could. He sought an opinion from former counsel for LPC that his shares could be transferred without restrictions. When it developed that counsel was no longer in a position to consider giving such an opinion, he did not try to dispose of his shares without restrictions, but, as heretofore described, sought to prevail upon the defendant Witter to buy him out. All of the investors in all six financings retained their securities. None except plaintiff claimed a violation of the Act. As for the manner of offering the securities, there was never any advertised or public solicitation. Offerings in which plaintiff participated subsequent to the first were based upon the proportion of LPC's securities owned by each offeree and on each occasion plaintiff subscribed to the full number of shares available and allotted to him.

Against this background, plaintiff's response to the affirmative defense of exemption as non-public offerings hinges on two facts: first, plaintiff did not sign, and defendants did not submit to him at any time, an "investment letter" negating any intention to obtain the LPC securities for distribution; nor did the stock certificates bear a legend to that effect. Second, in the language of one of plaintiff's requests for findings, no investor had access to the type of information which would have appeared in a registration statement because no such information was available; specifically, no reliable financial statements existed for any period after December 31, 1964. The first point relates mainly to the factual issue of the intent of the parties to the offerings. Without question, the presence or absence of an investment letter or legend is a factor bearing upon the ultimate question of exemption. Its significance was recognized explicitly in Securities Act Release No. 33–5121, 36 Fed.Reg. 1525. However, it is but one of several relevant factors, and at the trial the investment intent of plaintiff and the other parties was never seriously disputed. Moreover, the complaint described plaintiff's shares as subject to transfer restrictions and plaintiff's demand letter of February 10, 1970 to defendant Witter stated, "Applying a discount of 25% for *letter stock*, I would sell my holdings for $110,000." (emphasis added).

Plaintiff's second point, the lack of reliable financial statements, lies at the heart of the case. For an extended period before the acquisition, LPC's accounting system had failed to keep up with transactions and its books of account were incomplete. All the investors, including plaintiff, knew this before they decided to invest; and also knew that this was one of the reasons why they were advised that additional capitalization might prove necessary. The full extent of the bookkeeping and accounting deficiencies was not appreciated by any of the investors, including the defendants, until after the acquisition.

Before the second financing, however, the full extent had been learned and was reported to all the investors; and thereafter they were kept fully informed. In an effort to cure the deficiencies, a new accounting firm was engaged soon after the acquisition to audit the books and bring them up to date. It worked for six months on this project. Thereafter, because accountants may not properly audit their own work, another accounting firm was engaged to make an audit of such financial statements as had been compiled. But no certifiable statements were forthcoming because of the difficulty of determining a reliable starting point for the 1967 accounting year. This situation prevailed throughout 1968 and into 1969, well beyond the period of plaintiff's purchases of LPC securities.[3] Thus plaintiff has been correct in pointing out that the investors in LPC securities, like the employees in the Ralston Purina Co. case, *supra,* 346 U.S. at 127, 73 S.Ct. at 985, 97 L.Ed. 1494, "were not shown to have access to the kind of information which registration would disclose."

It does not follow, however, that the exemption must necessarily be denied. The test remains whether defendants proved that the particular class of offerees had no practical need for the protections afforded by registration, and the outcome depends not on any one factor but on all the surrounding circumstances. Simply to assert that the offerees did not have access to the kind of information which registration would disclose is to paint with two broad a brush. Thirty-two separate items of information are called for by a registration statement. 15 U.S.C. §§ 77aa, Schedule A. Some items are obviously more important than others, e. g., in the instant case defendants did not inform plaintiff that LPC was obligated to pay the corporate defendant, on a deferred basis, a $15,000 underwriter's fee on the

first financing, which information would be reported as item (17) of Schedule A under § 77aa. But plaintiff made little of this minor omission and defendants did not deal with the point beyond introducing the relevant agreement in evidence and showing that payment had never been made. Financial information covering the three years preceding the issuance of the securities, to be disclosed in items (25), (26) and (27) of Schedule A, is extremely important, generally speaking. But again, some items in the financial statements of an issuing corporation have a much greater bearing on the investment merit of its securities than others. In this case the missing information was basically the extent of accounts payable. The fact that they were not accurately recorded on LPC's books was known by all the offerees from the beginning. After the acquisition, bills were received for liabilities not reflected in LPC's books and accountants reconstructed its financial history. Previous to the second financing and thereafter, accounts payable at the time of acquisition could be estimated but never stated precisely enough for certification by public accountants.

Defendants have stressed the impossibility of furnishing information which they themselves could not obtain despite diligent efforts and have argued that to impose impossible burdens on issuers would prevent recapitalization of companies with incomplete records. This argument is wide of the mark. The touchstone under § 4(2) is the offerees' need, not the issuer's. Companies unable to furnish significant financial information may be compelled to forego refinancing except by private lending institutions. In the present context, the determinative question appears to be, how much reliance would the offerees probably have placed upon the particular missing information, had it been discoverable and disclosed to them,

---

3. A proxy statement issued in October, 1969 in connection with a merger of LPC and a small, copper mining corporation included a quaint reference to LPC's accounting records as having been kept "on a modified cash basis". The problem was eventually solved, or perhaps buried, by a shift from the cash to accrual basis of accounting.

in deciding whether to invest? In this case, defendants have shown that such reliance would probably have been minimal.[4] Thus the offerees' lack of access to the particular kind of information which registration would have disclosed in this case is not *per se* fatal to the defendants' claim of exemption but is only one of the many attendant circumstances which must be assessed in applying the *Ralston Purina* test. Without restating them all, we conclude that, despite the lack of investment letters and of access to an item of relevant financial information, defendants sustained their burden of proving that the four financings by LPC in 1967 and 1968 in which plaintiff participated did not involve any public offering and were therefore exempt from the provisions of § 5 of the Act pursuant to § 4(2), 15 U. S.C. § 77d(2).

Plaintiff proved a prima facie case under the Massachusetts Blue Sky Law then in effect,[5] Mass.G.L. c. 110A, §§ 5, 18, in that the defendants were sellers within the meaning of § 18, the sales occurred in Massachusetts inasmuch as plaintiff accepted defendants' offers while in Massachusetts, and defendants filed no notices of intention or statements of information pursuant to § 5. However, no sales except to plaintiff occurred in Massachusetts and it would appear that the sale in October, 1967 was exempt under § 3(a) and that those in 1968 were exempt under § 3(e). Plaintiff has countered these apparent defenses with evidence of a phone call during July, 1968 by defendant Witter to one Flood, a securities analyst employed at Old Colony Trust Company in Boston, in which Witter asked Flood if he would be interested in investing in a travel company. Flood replied that he was fully invested at the time and would therefore not be interested. That ended the conversation. Flood and plaintiff were friends, had discussed plaintiff's investment in LPC and plaintiff had told Flood that, should an opportunity arise, he would try to arrange an investment by Flood in LPC. It was at plaintiff's suggestion that Witter phoned Flood at Boston.

The transactions at issue were exempt under Mass.G.L. c. 110A, § 3. The telephone conversation from Witter to Flood was in no way related to the sale to plaintiff in October, 1967 and did not prevent it from being an "isolated sale" within the meaning of § 3(a). The phone call came months later and could not alter the character of a transaction long since concluded between the parties. Secondly, the Massachusetts statute unlike the federal law dealt with sales, not offers to sell, and Witter's phone call to Flood was not a sale nor indeed even an offer but rather a preliminary inquiry. Thirdly, plaintiff should probably be estopped from nullifying the statutory exemption on the basis of a conversation which he himself promoted. Finally, defendants' sales to plaintiff during 1968 are plainly exempt under § 3(e), as explained *ante* in this memorandum, and perhaps under § 3(a) as well.

Accordingly judgment shall be entered for defendants on counts I, II and V of the complaint and it is ordered that the case be dismissed.

---

4. The same could not, of course, be said of other types of missing financial information, e. g., a sizeable lien or attachment on company assets, or a burdensome, long-term executory contract. It is also unlikely that such items would be undiscoverable by issuers.

5. Massachusetts has since adopted the Uniform Securities Act, Mass.G.L. c. 110A, §§ 101–417, effective November 1, 1972.