Ruth Brooks LeCROY, Plaintiff,

v.

DEAN WITTER REYNOLDS, INC., Defendant.

No. LR–C–81–415.

United States District Court, E.D. Arkansas, W.D.

Feb. 1, 1984.

Wesley Ketz, Jr., Batesville, Ark., for plaintiff.

Peter Kumpe, Wright, Lindsey & Jennings, Little Rock, Ark., for defendant.

## MEMORANDUM AND ORDER

EISELE, Chief Judge.

Pending before the Court is defendant's motion for partial summary judgment. For the reasons stated below, the motion will be granted in part and denied in part.

This case involves the sale of certain securities by Dean Witter Reynolds, Inc., the defendant, to Ms. Ruth LeCroy, the plaintiff. Ms. LeCroy's complaint includes nine causes of action premised on the Securities Act of 1933, the Securities Exchange Act of 1934, the Arkansas Securities Act of 1959, and the Arkansas common law theories of fraud and intentional infliction of emotional distress. Though the bases for liability are numerous, the gist of Ms. LeCroy's complaint is quite simple.

Ms. LeCroy claims that in September of 1978 she was approached by an agent of the defendant about investing some of her savings. She states that, being of advanced age, she was interested in investing her savings in a way that would secure for her a monthly income. Specifically, she states she informed defendant's agent that: (1) she was advanced in years and did not want any long-term investments; (2) she needed a return on her investment that would be greater than a return she could obtain from a savings account; and (3) she wanted her principal available for use in case it was needed. She ultimately tendered $25,128.02 to defendant who purchased for her 25 units of a security known as The Corporate Income Fund ("Fund").

Ms. LeCroy apparently became dissatisfied with the securities purchased and brought this suit on July 1, 1981, on the grounds that: (1) the Fund is a long-term investment not suited to the needs she made expressly known to defendant; (2) the monthly income from the Fund was approximately $190, a sum less than that she desired and could have obtained from a savings account; and (3) the Fund did not mature for 26 years during which time the value of her principal diminishes and access to her principal is impaired.

In short, Ms. LeCroy claims defendant purchased securities of a type she expressly stated she did not desire and therefore seeks a recission of the sale, actual damages in the amount of $25,128.02, interest on that sum at 6% per annum, punitive damages of $1,000,000, compensatory damages for personal injury and mental and emotional distress in the amount of $150,000 and costs and attorney's fees.

It is important to keep in mind what the plaintiff is not alleging. She is not claiming that the Fund shares themselves were valueless or had some value less than what she paid. Nor does she claim that the Fund itself is valueless or exists to defraud its shareholders. She asserts only that *these securities*, that is, shares of the Fund, were not the securities she bargained for, and that she was defrauded into purchasing them.

The defendant has moved for partial summary judgment on three points. First, it contends that the plaintiff's first two causes of action, which stem from alleged violations of section 5 of the Securities Act of 1933, 15 U.S.C. § 77e, are barred by the applicable statute of limitations. Second, it urges the Court to dismiss plaintiff's claim for intentional infliction of emotional distress. Third, it requests the Court to make a ruling setting forth the maximum amount of damages that the plaintiff may recover if the defendant is found liable for plain-

tiff's third, fourth, fifth, sixth and eighth causes of action.

██ As a preliminary matter, the Court recognizes the drastic nature of the summary judgment remedy. The Court may grant summary judgment only if "the moving party has established his right to a judgment with such clarity as to leave no room for controversy and the non-moving party is not entitled to recover under any discernible circumstances." *Butler v. MFA Life Insurance Co.*, 591 F.2d 448, 451 (8th Cir.1979). Furthermore, the Court must view all the evidence in the light most favorable to the non-moving party, *Camfield Tires, Inc. v. Michelin Tire Corp.*, 719 F.2d 1361, 1364 (8th Cir.1983), in determining whether a genuine issue of material fact exists that would preclude the entry of summary judgment. In the context of defendant's statute of limitations defenses, the Court notes that summary judgment is appropriate if the action is clearly barred, but that if the running or tolling of the statute requires the adjudication of facts, summary judgment is inappropriate. *See Admiralty Fund v. Jones*, 677 F.2d 1289, 1293 (9th Cir.1982) (citing C. Wright & A. Miller, *Federal Practice and Procedure* § 2734 at 647–48 (1973)). Although cognizant of these strictures on the availability of the summary judgment remedy, the Court nevertheless finds that defendant's motion must be granted in part and denied in part.

## I. *Statute of Limitations*

The defendant contends that the applicable statute of limitations bars plaintiff's first and second causes of action. The plaintiff's first two causes of action are both premised on § 5(b)(2) of the 1933 Securities Act. Section 5(b)(2) prohibits any person from selling or delivering a security unless the security is preceded or accompanied by a properly-drawn prospectus. The plaintiff contends that in September of 1978 the defendant delivered two securities to her without providing her with the required prospectuses.

██ Technically, the plaintiff is required to plead and prove compliance with the statute of limitations. *See McMerty v. Burtness*, 72 F.R.D. 450, 453 (D.Minn. 1976); L. Loss *III Securities Regulation*, Ch. 11(C)(1)(f)(ii) at 1744 (2d ed. 1961) (hereinafter cited as "Loss"). *See also Cook v. Avien, Inc.*, 573 F.2d 685, 695 (1st Cir. 1978). Plaintiff's complaint omits any such pleading. Nevertheless, the defendant has raised the issue in its motion for partial summary judgment and in her response, the plaintiff has asserted proper compliance with the applicable limitations periods. The Court will therefore consider whether the plaintiff has in fact timely filed her first two causes of action.

### A. *Applicable Statutory Provisions*

Section 5 provides in pertinent part:

It shall be unlawful for any person, directly or indirectly

    ✥     ✥     ✥     *     *     *

(2) to carry or cause to be carried through the mails or in interstate commerce any such security for the purpose of sale or for delivery after sale, unless accompanied or preceded by a prospectus that meets the requirements of subsection (a) of section 77j of this title.

██ The provision, standing alone, creates no private cause of action. However, Congress infused life into section 5 by providing under section 12(1), 15 U.S.C. § 77*l*(1), that a private party may sue for violations of section 5. The applicable statute of limitations for section 12(1), appears in section 13, 15 U.S.C. § 77m, which states:

No action shall be maintained to enforce any liability created under section 77k or 77*l*(2) of this title unless brought within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence, or, *if the action is to enforce a liability created under section 77l(1) of this title, unless brought within one year after the violation upon which it is based. In no event shall any such action be*

*brought to enforce a liability created under section 77k or 77l(1) of this title more than three years after the security was bona fide offered to the public,* or under section 77*l* (2) of this title more than three years after the sale.

(emphasis added).

### B.  *One-Year Limitations Period*

The defendant contends that the one-year limitations period has run and that consequently the plaintiff's first two causes of action are time-barred. The plaintiff essentially concedes that the complaint was not filed within one year of the date that the securities were offered, sold or delivered. *See Mason v. Marshall,* 412 F.Supp. 294, 299 (N.D.Tex.1974) (period commences as of the last of these three events), *aff'd,* 531 F.2d 1274 (5th Cir.1976); *Buchholtz v. Renard,* 188 F.Supp. 888 (S.D.N.Y.1960). Nevertheless, the plaintiff urges the Court to apply the Federal Equitable Tolling Doctrine and find that her first two causes of action are not barred.

### 1.  *Federal Equitable Tolling Doctrine*

■ At the outset, the Court notes that the doctrine has limited application. Equitable tolling is invoked primarily in two situations: where fraud forms the basis of the federal cause of action; and where other non-fraud-based federal causes of action have been concealed by the tortfeasor.[1] *See Dyer v. Eastern Trust & Banking Co.,* 336 F.Supp. 890, 901 (D.Me. 1971). In practical effect, the doctrine tolls the running of the applicable limitations period until the fraud or the fraudulent

concealment is (or should have been) discovered by the plaintiff.

■ Unquestionably, the equitable tolling doctrine applies in the context of statutes of limitations under the federal securities laws. The doctrine, however, must be applied in the light of the particular facts and circumstances and consistently with the policies underlying the cause of action being asserted. The mere fact that the Securities Act was designed largely to proscribe and redress the consequences of fraud in the securities markets does not mean that the equitable tolling doctrine automatically applies in each and every securities case.

■ The doctrine should obviously apply where a broker/dealer fraudulently conceals any violation of the securities acts (whether or not the underlying violation constitutes fraud).[2] *See Peoria Union Stock Yards Co. v. Penn Mutual Life Insurance Co.,* 698 F.2d 320, 326 (7th Cir. 1983). Where, however, an investor seeks equitable tolling based solely upon the allegation that the defendant has violated the Securities Act, the Court must scrutinize the established facts and circumstances before applying the doctrine. The doctrine has natural appeal in the classic case of Securities Act fraud, such as one brought under sections 11 or 12(2). In such instances, the wrongdoer's fraudulent act may mislead the investor and thereby convince the investor to make a purchase he might otherwise shun. If completely successful, the wrongdoer will not only defraud the investor, but also disguise the fraudulent acts so that the investor never knows he

1. A third situation would arise where the investor has been induced not to take legal action based upon statements of the broker, et. al., that *corrective steps* would take place that would make legal action unnecessary. *See, e.g., Katz v. Amos Treat & Co.,* 411 F.2d 1046, 1055 (2d Cir.1969).

2. As a corollary, the doctrine might also apply where actions of the broker/dealer that are wholly independent of those creating liability under the securities acts induce the investor to sleep on his rights. A case cited by plaintiff provides a good example of the need for invoca-

tion of the doctrine. In *Houlihan v. Anderson-Stokes, Inc.,* 434 F.Supp. 1319 (D.D.C.1977), the court invoked the equitable tolling doctrine where the defendant had represented to the plaintiff at the time the securities were offered that registration was unnecessary and also told the plaintiff that it would agree to an extension of time in which plaintiff could file suit. *But see Livens v. William D. Witter, Inc.,* 374 F.Supp. 1104 (D.Me.1974) (no tolling because precatory statements made by defendant would not have reasonably induced plaintiff to delay filing of suit).

has been defrauded. In recognition of this fact, courts have uniformly applied the doctrine to toll the running of the one-year limitations period contained in section 13.[3]

On the other hand, the nature of actions brought pursuant to section 12(1) for violations of section 5(b)(2) varies considerably from the forms of fraud proscribed under section 11 and 12(2), as outlined above. Section 12(1) creates liability *inter alia* where a broker breaches section 5(b)(2) by failing to provide a prospectus before or simultaneously with the sale or offer of a security. Obviously, the acts giving rise to the violation do not fall into the conventional definition of fraud. *See Ingenito v. Bermec Corp.*, 441 F.Supp. 525, 553 n. 26 (S.D.N.Y.1977) ("actions under § 12(1) are not themselves in the nature of fraud"). Indeed, the mandate set forth in section 5(b)(2) does not seek to prohibit fraud *per se;* instead, it simply seeks to ensure that, by requiring the provision of information *before* the investor commits himself to purchase, the investor will at least have had the opportunity to make a well-informed investment decision. Seen in this light, it is apparent that when a broker violates section 5(b)(2), thereby setting himself up for liability under section 12(1), he has merely committed a *procedural* infirmity, not fraud.

Since a violation of section 5(b)(2) does not alone actually constitute fraud, a plaintiff seeking to invoke equitable tolling must look beyond the underlying cause of action for some other basis on which to toll the running of the statute of limitations. *See id.*

### 2. Inapplicability of the Equitable Tolling Doctrine

In the case at bar, the plaintiff has failed to identify any conduct—independent of the alleged violations of section 5(b)(2)—that would justify invocation of the equitable tolling doctrine. Although plaintiff cites *Houlihan* as supporting her position, her reliance on that case is misplaced. Nothing in the complaint or other submissions suggests that the defendant or its agents made any post-sale fraudulent misrepresentations and, specifically, the plaintiff contends neither that she was told a prospectus was unnecessary nor that the defendant told her that she could delay in filing her complaint without adverse consequences. Moreover, as noted above, the mere violation of section 5(b)(2), without more, provides insufficient grounds for tolling the one-year statute of limitations. The Court must therefore conclude that the one-year statute of limitations was not tolled for purposes of plaintiff's section 12(1) claim. *Cf. Upton v. Trinidad Petroleum Corp.*, 468 F.Supp. 330 (N.D.Ala. 1979), *aff'd on other grounds*, 652 F.2d 424 (5th Cir.1981) (no tolling of limitations period in action brought where defendants failed to register certain securities).

The period of limitation for an action premised upon a violation of section 5(b)(2), begins to run from the date the violation occurred. *See Gridley v. Cunningham*, 550 F.2d 551, 552 (8th Cir.1977). Courts have generally interpreted this as meaning that the period runs from latest of three events; the date the security was offered; the date it was sold; or the date it was delivered. *See Mason v. Marshall*, 412 F.Supp. 294, 299 (N.D.Tex.1974), *aff'd*, 531 F.2d 1274 (5th Cir.1976). Assuming that the one-year limitation period commenced on September 29, 1978,—the date the securities were delivered to the plain-

---

**3.** Indeed the doctrine is explicitly utilized in connection with the applicable one-year limitations period for actions brought under §§ 11 and 12(2). *See* § 13. Nevertheless, with limited exception, the courts have agreed that in the above-described case of fraud, the three-year limitations periods contained in section 13 are never subject to equitable tolling. *See, e.g., Admiralty Fund v. Hugh Johnson & Co.*, 677 F.2d 1301, 1308 (9th Cir.1982); *Payne v. Fidelity*

*Homes of America*, 437 F.Supp. 656 (W.D.Ky. 1977); *Summer v. Land Leisure, Inc.*, 664 F.2d 965, 968 (5th Cir.1981); *Payne v. Fidelity Homes of America*, 437 F.Supp. 656 (W.D.Ky.1977); *Cowsar v. Regional Recreations, Inc.*, 65 F.R.D. 394, 397 (M.D.La.1974). *Contra In re Home-Stake Production Co. Securities Litigation*, 76 F.R.D. 337, 344–45 (N.D.Okl.1975). The courts have generally found that Congress meant the three-year limitation period to be absolute.

tiff—it is clear that the period had long since run by the time plaintiff filed her complaint on July 1, 1981.

### B. *Three-Year Limitations Period*

Nevertheless, plaintiff raises one final argument in an attempt to breathe life into her otherwise expired section 12(1) claim. She states: "Plaintiff's action was brought within three years of her purchase of the certificates from Defendant and her action is not barred by the applicable statute of limitations." (Plaintiff's brief, July 8, 1982, at p. 3.) It appears plaintiff's contention seems to be that, even if untimely under the one-year limitation period, since plaintiff filed her claim within the three-year limitations period included under section 13, her section 12(1) claim is not barred.

The Court must disagree. From a literal reading of the statute and a reference to the legal authorities, the Court concludes as a matter of law that the one- and three-year limitations periods contained in section 13 are cumulative, not alternative. *See Osborne v. Mallory*, 86 F.Supp. 869, 873–74 (S.D.N.Y.1949); Loss, ch. 11(C)(1)(f)(i) at p. 1742, n. 188. Therefore, the plaintiff must be able to demonstrate not only that she filed her action within one year of the section 5(b)(2) violation, but also that the filing occurred within three years after the securities were first[4] bona fide offered to the public. If she fails to meet

either limitation period, her cause of action is time-barred.

The Court's conclusion about the cumulative nature of the two limitations periods is not reached without some degree of disquietude. For from this reading, any person who invests in a security more than three years after it was first offered to the public is automatically time-barred from suing for a violation of section 5(b)(2) no matter how quickly after the sale that person files his complaint.[5] The three-year limitation period therefore stands as a trap for the unwary investor who fails to receive a prospectus in connection with a slow offering.[6] Obviously, this defeats the very core principle upon which the section 5(b)(2) requirement is based: At any time after three years from the initial offering, a broker may sell or offer to sell a security without providing a prospectus and be completely insulated from liability under section 12(1). To the extent that this "cumulative" interpretation permits unscrupulous brokers to act with impunity after the third year following the initial public offering, it undermines the Act's fundamental policy of ensuring that investors possess (or have the opportunity to possess) a modicum of information about the securities they ultimately purchase.

In spite of these theoretical misgivings about the cumulative nature of the two limitations periods in section 13[7], the Court

---

**4.** Most authorities agree that the three-year period commences on the date the security was *initially* bona fide offered to the public. *See Morse v. Peat, Marwick, Mitchell & Co.,* 445 F.Supp. 619, 621 (S.D.N.Y.1977); *Kramer & Harrison v. Scientific Control Corp.,* 352 F.Supp. 1175, 1176 (E.D.Pa.1973); Loss, ch. 11(C)(1)(f)(i) at p. 1742. The court in *Morse* interpreted this as the effective date of the registration statement. 445 F.Supp. at 622.

**5.** Assume, for example, that a security is first bona fide offered to the public on January 1, 1980. Sales of the security are slow and an individual buys a share on January 5, 1983. The next day he realizes the security is worthless. He remembers that he never received a prospectus. On January 6, 1983, he files suit pursuant to section 12(1), alleging violations of section 5. Under the literal reading of section

13, the investor's claim would be time-barred by the three-year limitation, irrespective of the fact that his claim is clearly within the one-year limitation period.

**6.** Professor Loss has also observed this phenomenon, noting "it is literally possible for the statute [of limitations] to expire before the purchaser acquires the security in the case of a very slow offering which may still be going on after three years!" L. Loss, *supra,* at p. 1743.

**7.** *Cf. Diskin v. Lomasney & Co.,* 452 F.2d 871, 875–76 (2d Cir.1971) (Friendly, C.J.) ("With respect to the one-year period of limitation, although § 13 dates this from the "violation in cases of claims under § 12(1) it would be unreasonable to read § 13 as starting the short period for an action at a date before the action could have been brought—a construction which might

remains firmly convinced that since plaintiff's action is untimely under the one-year limitations period, the plaintiff's alleged compliance with the three-year limitations period is irrelevant.[8] Thus, plaintiff's first and second causes of actions premised upon section 12(1) must be dismissed.

## II. *Emotional Distress*

The defendant argues that the Court should decline to hear the plaintiff's claim for intentional infliction of emotional distress. The plaintiff's emotional distress claim is based neither on the securities laws nor on common law fraud. Instead, she states that her claim rests on an independent cause of action for "intentional infliction of emotional distress" ("emotional distress") or "outrage," which was recognized by the Arkansas Supreme Court in *M.B.M. Co. v. Counce*, 268 Ark. 269, 596 S.W.2d 681 (1980).

In reply, the defendant asserts that the emotional distress claim should be dismissed for two reasons: first, because under the circumstances of this case the Court should not exercise pendent jurisdiction to hear this state claim; and second, because the plaintiff has failed to adequately plead and establish her claim.

### A. *Exercise of Pendent Jurisdiction*

■ As a threshold matter, the Court finds that the emotional distress claim is properly before the Court as a pendent claim. As noted in *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966), a federal court possesses pendent jurisdiction of a related state claim if the federal claim is "substantial," if the state claim arises out of the same "nucleus of operative fact" as does the federal claims, and if the nature of the claims is so related that a plaintiff ordinarily would be expected to try all in the same proceeding.

In this case, the plaintiff's emotional distress claim meets the three prongs of the *Gibbs* test. The federal claims, which are premised upon the Securities Act of 1933 and the Securities and Exchange Act of 1934, comprise the core of her cause of action. The Court finds them to be substantial. *See Levering & Garrigues Co. v. Morrin*, 289 U.S. 103, 105–06, 53 S.Ct. 549, 550, 77 L.Ed. 1062 (1933). *Koke v. Stifel, Nicolaus & Co., Inc.*, 620 F.2d 1340, 1346 (8th Cir.1980). The state claim also arises out of the same "nucleus of operative facts" upon which the federal claims are based. Indeed, if the federal claims were dropped, the Court believes that little, if anything could remain of plaintiff's emotional distress claim. *Cf. Cunningham v. Dean Witter Reynolds, Inc.*, 550 F.Supp. 578, 581–82 (E.D.Calif.1982) (pendent state claim for intentional infliction of emotional distress would not be ordered arbitrated pursuant to contract provision due to close connection with federal securities laws claims). Finally, logic would dictate that for the sake of judicial economy the emotional distress claim be litigated in the same proceeding as plaintiff's securities laws claims.

■ The defendant suggests that irrespective of these findings, the Court should decline to hear the emotional distress claim because Arkansas has only recently recognized the tort and the law is not well-settled. In all fairness to the defendant, the tort of emotional distress is, under Arkansas law, in its incipient stages of development. *See Givens v. Hixson*, 275 Ark. 370, 372, 631 S.W.2d 263 (1982) (the tort is "new and still developing"). The Court cannot disagree with the theory underlying defendant's argument that unsettled areas of state law are best left to state courts for resolution and refinement. *See Gibbs*, 383 U.S. at 726, 86 S.Ct. at 1139. Neverthe-

---

lead in some extreme cases to a running of the statute of limitations before the claim had even arisen.")

**8.** The Court observes that, in fact, the plaintiff's § 12(1) claim may actually be untimely under the three-year limitations period. As noted above, the complaint was filed *almost* three years after plaintiff's purchase. From the nature of the security involved it is possible that the initial public offering of the security occurred long before plaintiff made her purchase.

less, the Court believes that, although not comprehensively litigated, the tort's basic contours seem sufficiently established to permit this Court's exercise of pendent jurisdiction. *See, e.g., Orlando v. Alamo,* 646 F.2d 1288, 1290 (8th Cir.1981); *McArthur v. Robinson,* 568 F.Supp. 393, 396 (E.D. Ark.1983); *Givens,* 275 Ark. 370, 631 S.W.2d 263 (1982); *M.B.M. Co. v. Counce,* 268 Ark. 269, 596 S.W.2d 681 (1980). *See also Dalrymple v. Fields,* 276 Ark. 185, 190, 633 S.W.2d 362 (1982); *Fuller· v. Marx,* 724 F.2d 717, 719 (8th Cir.1984); Case Note, *Intentional Infliction of Emotional Distress—Escaping the Impact Rule in Arkansas,* 35 Ark.L.Rev. 533 (1981). Furthermore, the Arkansas Supreme Court's general embracement of the approach outlined in the *Restatement (Second) of Torts* § 46, *see, e.g., Givens,* 275 Ark. at 372, 631 S.W.2d 263; *Counce,* 268 Ark. at 280, 596 S.W.2d 681; *see also Orlando,* 646 F.2d at 1291, n. 5, suggests that this Court may consult the *Restatement* for additional insights as it carries out its inquiry. Thus, the Court concludes that with the aid of these legal authorities, as well as that obtained from other federal decisions addressing the tort in the context of securities fraud cases, it is appropriate to exercise pendent jurisdiction over the plaintiff's emotional distress claim.

## B. *Nature of the Plaintiff's Emotional Distress Claim*

The plaintiff raises her emotional distress claim in her ninth cause of action, where she contends:

> As a direct and proximate result of Defendant's wilful and wanton actions and omissions, through its agents and employees, Plaintiff has suffered severe mental and emotional distress, suffering and worry, and physical injuries in the form of loss of vision, revival of a dormant diabetic condition and an overall impairment of her health.

As a result thereof, Plaintiff is entitled to punitive damages, damages for mental and emotional distress and damages for consequential physical injuries.

(Plaintiff's Complaint, ¶¶ 41, 42.) This claim incorporates by reference the allegations raised in numerous paragraphs throughout the Complaint and implements the factual assertions contained in said paragraphs to support her claims for damages for mental and emotional distress (as well as for damages for "consequential physical injuries" and punitive damages).

The dearth of substantive facts in the Complaint tends to make it difficult to understand the nature of plaintiff's claim.[9] It appears that the only factual assertions that could possibly lend credence to her emotional distress claim arise in paragraphs 17, 19, 23, 25, 26, 33, 34, 37, 38, 41 and 42 of the Complaint. In those paragraphs, the plaintiff essentially alleges:

1) That the defendant falsely represented to plaintiff that her security would have a greater rate of return than that obtained in a bank account;

2) That defendant knowingly made false representations that plaintiff's security was not a long-term investment and failed to inform plaintiff that her principal could not be withdrawn before maturity without resulting in a substantial loss, and that said representations and material omissions were willfully made by plaintiff in order to induce her reliance and to cause her to invest without having all necessary information.

3) That defendant willfully failed to inform the plaintiff about the nature of her investment, the percentage of return thereon and the risk involved.

4) That defendant failed to purchase certain securities requested by plaintiff and instead purchased shares in a mutual fund without plaintiff's permission.

---

**9.** Plaintiff is not required to plead her case with great specificity, *see* Fed.R.Civ.P. 8(a); *Robinson v. MFA Mutual Ins. Co.,* 629 F.2d 497 (8th Cir. 1980), yet plaintiff has relied almost entirely upon her pleadings to support her emotional

distress claim. Even resort to plaintiff's deposition reveals little that could possible support her claim. In short, plaintiff's mere reliance on the bold assertions cripples her position.

5) That defendant knew or should have known that, in light of plaintiff's advanced age and short life expectancy, the investment in securities having a long-term maturity was not suitable for the plaintiff.

6) That plaintiff has suffered severe mental and emotional distress, suffering and worry.

The plaintiff's deposition reveals the following information that relates, albeit tangentially, to her emotional distress claim:

\* That plaintiff notified the defendant's agent that she did not want to invest in long-term securities having long-term maturity because of her age. *See* Deposition, pp. 21, 23, 30, 37, 76, 85, 90.

\* That she told the agent she could not afford to lose money, and that she needed a return on her investment of at least $200 per month. *See* deposition, pp. 12, 22, 45, 56, 85, 86, 90.

\* That defendant never provided any literature or other written information, such as a prospectus, in conjunction with the sale of the securities. *See* deposition, pp. 31, 89.

\* That she had no knowledge of investments and that she relied heavily on the expertise of the defendant. *See* deposition, pp. 36, 86.

\* That she is elderly. *See* deposition, p. 5.

\* That she suffered physical and emotional damages as a result of her dealings with the defendant. *See* deposition, pp. 39, 40, 49, 50.

The plaintiff summarizes the theory underlying her emotional distress claim by stating:

Plaintiff is a woman of advanced years who purchased the securities not to obtain a commercial advantage, but to simply protect herself against a loss of income in the later years of her life. The defendant knew of the Plaintiff's goals in purchasing the securities. Clearly, if the Defendant misled, deceived, or defrauded the Plaintiff, the natural consequence of that action would be that Plaintiff would suffer mental and emo-

tional distress, a fact of which Defendant was well aware.

(*See* Plaintiff's Memorandum, July 8, 1982).

The defendant's argument is straightforward: It simply contends the plaintiff has failed to allege or proffer facts that would constitute the tort of intentional infliction of emotional distress.

### C. *Applicable Case Law*

The seminal Arkansas case on the subject is *M.B.M. Co. v. Counce*, 268 Ark. 269, 596 S.W.2d 681 (1980), where the Arkansas Supreme Court announced that:

[O]ne who by extreme and outrageous conduct willfully or wantonly causes severe emotional distress to another is subject to liability for such emotional distress and for bodily harm resulting from the distress.

  \*  \*  \*  \*  \*  \*

The emotional distress for which damages may be sought must be so severe that no reasonable person could be expected to endure it. It [the distress] must be reasonable and justified under the circumstances. Liability arises only when the distress is extreme.

*Id.* at 280, 596 S.W.2d 681 (citations omitted).

■ In describing the elements of the tort under Arkansas law the Eighth Circuit has stated that a plaintiff "must show (1) extreme and outrageous conduct, (2) willfully or wantonly performed, (3) which caused severe emotional distress." *Orlando v. Alamo*, 646 F.2d 1288, 1290 (8th Cir.1981) (citing *Counce* ).

More recently, the Arkansas Supreme Court addressed the tort distress claim that had been dismissed on partial summary judgment. *Givens v. Hixon*, 275 Ark. 370, 631 S.W.2d 263 (1982). In affirming the lower court's dismissal, the Supreme Court dispelled any notion that the tort should be liberally interpreted.

The new and still developing tort of outrage is not easily established. It requires clear-cut proof. "Liability has

been found *only* where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." Restatement of Torts (2d), § 46m Comment d (1965); *M.B.M. Co. v. Counce*, 268 Ark. 269, 596 S.W.2d 681 (1980). It is for the trial court to determine, in the first instance, whether the conduct may reasonably be regarded as so outrageous·as to permit recovery. Restatement, *id.*, Comment h. Merely describing conduct as outrageous does not make it so. If Givens's testimony presents an issue of fact, then any employee who is abruptly discharged by an angry boss is entitled to have the asserted tort submitted to a jury. That is not the law. The trial judge was unquestionably right in granting the partial summary judgment.

*Id.* at 372, 631 S.W.2d 263.

In several federal decisions, violations of the securities laws have provided the basis for intentional infliction of emotional distress claims. *See, e.g., Malandris v. Merrill Lynch, Pierce, Fenner & Smith*, 703 F.2d 1152 (10th Cir.1981), *cert. denied,* ―― U.S. ――, 104 S.Ct. 92, 78 L.Ed.2d 99 (1983); *Emmons v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 532 F.Supp. 480 (S.D.Ohio 1982). In *Malandris*, an investor sued Merrill Lynch and one of its account executives, Mr. John Barron, alleging violations of federal and state securities laws, common law fraud and intentional infliction of emotional distress. The Tenth Circuit found that the plaintiff had made out a submissible case for her emotional distress claim. The thrust of her allegation was that the account executive took advantage of the lack of education possessed by the plaintiff and her husband, made investments in clear contravention of the plaintiff's specific wishes, induced the plaintiff's husband to forge the plaintiff's signature on documents relating to a margin account, threatened the plaintiff's husband with jail when he attempted to terminate the business relationship, and carried out a course of investment counseling that led the plaintiff to incur substantial financial losses. The facts indicated that the account executive had intentionally circumvented the plaintiff and dealt strictly with the plaintiff's husband when making changes in the plaintiff's investment portfolio. The Tenth Circuit made a detailed summary of the facts indicating the account executive's knowledge of the plaintiff's situation:

There was evidence that Barron was advised that plaintiff was an insecure, illiterate Korean woman; that she was so concerned with financial security that she refused to allow her husband any control over their finances; that Barron knew of the couple's frugal lifestyle, denying themselves even the simplest pleasures in order to save money; and that Barron knew that he was dealing with all the savings the plaintiff had. (IV A. 353–56). It was a permissible inference that Barron could reasonably anticipate an exaggerated reaction to the loss of the savings which plaintiff valued so high. We do not feel it necessary that Barron know specifically of Mrs. Malandris' previous depression or that she had previously been referred to a psychiatrist. *See* Restatement, Second of Torts § 46, comment f and illustrations 9–13.

*Id.* at 1166. The court therefore reasoned that although somewhat extreme, the plaintiff's reaction to the financial losses and the actions of the account executive could have been reasonably expected to cause severe emotional distress. Elsewhere in the opinion, the court observed:

Even if Mr. Barron did not intend to inflict severe emotional distress, the evidence would support inferences that such distress was "certain, or substantially certain, to result from his conduct," *see* Restatement, Second of Torts, § 46, comment i, and that Barron knew from the beginning of these transactions that the plaintiff was very concerned with financial security and wanted her money in a savings account; that even if his actions had not resulted in a loss, Mr. Barron should have reasonably foreseen that there was a "high degree of probability

that the emotional distress" would occur when plaintiff learned that her instructions had not been followed. *Id.* ". . . [R]eckless conduct causing emotional distress renders an actor as liable as if he had acted intentionally. *See* comment i to § 46." *Chuy v. Philadelphia Eagles Football Club, supra,* 595 F.2d [1265] at 1275.

We cannot accept defendant's contention that the conduct could not be found to be outrageous. There was evidence that Mr. Barron avoided consulting the plaintiff before making unauthorized transactions in her account, knowing that such transactions were directly contrary to her wishes; that he convinced her husband to misrepresent the facts to her and used Mr. Malandris as a pawn, knowing that the plaintiff insisted on having the account in her name alone because of her husband's gullability; that Barron continued to suggest high-risk investment decisions to Mr. Malandris, knowing the plaintiff was very concerned with financial security; and that even when the account showed a $30,000 loss, Barron persisted in trying to conduct other transactions with what remained of plaintiff's savings.

*Id.* at 1165.

One additional case involving a claim of intentional infliction of emotional distress in connection with alleged federal securities laws violations deserves mentioning. In *Kimmel v. Peterson,* 565 F.Supp. 476 (E.D.Pa.1983), a purchaser of securities and his family sued sixteen defendants including a securities broker alleging numerous securities acts violations. The investor contended that he had placed great faith in his broker and had stressed the importance of safety in his investment portfolio during the course of his three year association with the broker. Nevertheless, the broker acquired highly speculative stock for the investor and allegedly gave the investor false or misleading information in an effort to make the sale. Prospectuses furnished to the investor were deficient, and the investor was advised to purchase stocks on margin, without being notified of the at-

tendant risks. After hearing unfavorable publicity about the investments, the investor inquired several times about their relative safety. Each time, the broker allegedly downplayed the possible risks involved. Ultimately, the risks became manifest; the investor lost his shirt. *Id.* at 479–80.

The plaintiffs in *Kimmel* alleged that the foregoing acts would sustain a finding of intentional infliction of emotional distress. The plaintiffs asserted that they suffered significant mental and physical trauma due to the defendants' acts and that defendants knew or should have known that such trauma would have resulted.

The court disagreed, finding that, even assuming defendant's conduct was reckless or intentional and that it caused severe emotional distress, it was not "outrageous" as a matter of law. The court acknowledged plaintiff's argument that the controversy was "not a 'garden variety' securities fraud case, but rather a course of fraudulent conduct perpetrated by a trusted adviser." *Id.* at 499. It determined, however, that the conduct was simply not "outrageous" as contemplated in the *Restatement (Second) of Torts.* The court concluded:

> To hold otherwise would transform every sophisticated confidence scheme into an action for intentional infliction of mental distress in clear derogation of the narrow scope accorded this tort by the Pennsylvania courts.

*Id.*

### D. *Conclusion*

▮ As observed in comment h to the *Restatement (Second) of Torts,* § 46, "It is for the court to determine, in the first instance whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery, or whether it is necessarily so." After a close review of the facts and the applicable case-law, the Court must conclude that plaintiff has failed to identify conduct on the part of the defendant that meets the threshold requirements of the tort. Arkansas simply does not recognize the existence of liability

for infliction of emotional distress unless the tortfeasor's conduct "has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society." *Givens*, 275 Ark. at 372, 631 S.W.2d 263 (quoting the *Restatement (Second) of Torts*, § 46).

Unlike the situation arising in *Malandris*, there is no allegation that the defendant or its account executive engaged in an *extended* course of dealings contrary to plaintiff's wishes.[10] Ms. LeCroy does not contend that she fell victim to the types of subterfuges, threats and outright lying that arose in *Malandris*. Nor does she assert that she suffered from any educational or communicative handicaps that the defendant consciously tried to exploit. Finally, there is no allegation that the defendant squandered the plaintiff's money in highly speculative or otherwise indiscreet investments. In short, the conduct attributed to the defendant falls far short of the level of reprehensibility reached in *Malandris*, or even that attained in *Kimmel*.

■ The Court recognizes that deception and fraud associated with the sale of securities can, on occasion, create emotional distress. Moreover, a broker's repeated use of such unsavory business methods purely in the pursuit of exploitation and financial gain can offend the conscience of the average citizen. Yet under Arkansas law, mere fraud in connection with the sale of securities does not *ipso facto* make out a prima facie case for intentional infliction of emotional distress. Unless the defendant's acts are truly outrageous, an action for intentional infliction of emotional distress will not lie.

■ In the case at bar, the conduct attributed to the defendant was not so outrageous to trigger liability under the Arkansas tort of intentional infliction of emotional distress. Plaintiff's ninth cause of action must consequently be dismissed.

### III. *Damages*

■ The defendant also seeks a declaration of the maximum amount of damages recoverable by plaintiff if she prevails on her third, fourth and eighth causes of action (brought under Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b–5) and her fifth and sixth causes of action (brought under Section 22(a)(2) of the Arkansas Securities Act of 1959, Ark. Stat.Ann. § 67–1256(a)(2)).

On this point the Court agrees with the plaintiff that it is inappropriate to rule on the maximum amount of recoverable damages at this time. The facts, as they will be developed at trial, are necessary to determine the proper measure of damages to be applied. Although the Arkansas statute is quite explicit on the measure of damages applicable to plaintiff's fifth and sixth causes of action, Ark.Stat.Ann. § 67–1256(a), the rules with respect to Sections 10(b) and 10b–5, relating to plaintiff's third, fourth and eighth causes of action, are flexible and fact-dependent. The point was well summarized in *Austin v. Loftsgaarden*, 675 F.2d 168, 180–81 (8th Cir.1982), in which the court stated:

"[D]amages for securities fraud are determined in accordance with the extent to which false and misleading information actually harmed the complaining party . . . ." *Shapiro v. Midwest Rubber Reclaiming Co.*, 626 F.2d 63, 69 (8th Cir.1980), *cert. denied*, 449 U.S. 1079, 101 S.Ct. 860, 66 L.Ed.2d 802 (1981); *cf.* 15 U.S.C. § 78bb(a) (limiting plaintiff's recovery under the 1934 Act to "actual damages on account of the act complained of"). Failure by the complaining party to prove actual damages is fatal to the party's claim. *Shapiro, supra* at 70. Generally, the out-of-pocket measure of damages is applied in securities fraud cases, usually awarding plaintiff (in the case of a defrauded purchaser) the difference between the purchase price of

---

**10.** Furthermore, although her pleadings suggest that the defendant's account executive sold her shares in a long-term mutual fund, against her wishes, plaintiff admits in her deposition that the two never discussed her aversion to mutual funds, *see* deposition pp. 76, 85.

the security and its actual value on the date of purchase. (Footnote: Where fraud is found to have affected the open market price of the security because others were influenced by the same misrepresentations made to the person seeking recovery, the measure applied is the difference between the purchase price and the actual value on the date of discovery of the fraud. *Harris v. American Investment Co.*, 523 F.2d 220, 226 (8th Cir.1975) *cert. denied*, 423 U.S. 1054, 96 S.Ct. 784, 46 L.Ed.2d 643 (1976).) This measure, however, is "not a talisman"; the function of the court "is to fashion the remedy best suited to the harm" *Garnatz v. Stifel, Nicholaus & Co.*, 559 F.2d 1357, 1360 (8th Cir.1977), *cert. denied*, 435 U.S. 951, 98 S.Ct. 1578, 55 L.Ed.2d 801 (1978). Accordingly, a rescissional remedy, *id.*, or some other measure of damages in the nature of restitution may be allied. *Cf. Myzel v. Fields*, 386 F.2d 718, 742–43 (8th Cir. 1967), *cert. denied*, 390 U.S. 951, 88 S.Ct. 1043, 19 L.Ed.2d 1143 (1968) ("Rescission calls for cancellation of the bargain, and the return of the parties to the *status quo ante;* ... [b]ut where there exists no market value of the stock, the stock is no longer in existence, and there clearly has been a fluctuation in value ..., then what restitutional damages are to be awarded must depend upon the facts of the particular case.")

The actual damages principle requires that a rescissional or restitutional award be "reduced by any value received as a result of the fraudulent transaction." *Garnatz v. Stifel, Nicholaus & Co., supra* at 1361.

When this case comes to trial, the proper measure of damages will be determined after the proof is in. Accordingly, defendant's motion for summary judgment on this issue will be denied.

It is therefore Ordered that defendant's motion for summary judgment on plaintiff's first and second causes of action be, and it is hereby, granted and those counts are dismissed.

It is further Ordered that defendant's motion for summary judgment on plaintiff's ninth cause of action be, and it is hereby, granted and that count is dismissed.

It is further Ordered that defendant's motion for summary judgment on the maximum amount of damages recoverable on plaintiff's remaining causes of action be, and it is hereby, denied.

In light of the Court rulings herein, particularly on plaintiff's cause of action for emotional distress, the Court hereby dismisses all pending discovery motions in this case and directs the parties to proceed with discovery based on the remaining counts in plaintiff's suit. Should discovery problems arise hereafter, appropriate motions may be filed.