**W.T. STONE, Jr. and Jean Stone, Plaintiffs,**

v.

**FOSSIL OIL & GAS, a Delaware corporation; Earlee Exploration, an Oklahoma partnership composed of W.M. Bryan and Robert L. McPheron; Gaylan Adams, W.M. Bryan, and Robert L. McPheron, Defendants.**

Civ. No. 84–1645–JB.

United States District Court, D. New Mexico.

March 30, 1987.

Keleher & McLeon, Arthur O. Beach, Albuquerque, N.M., for plaintiffs.

Rodey, Dickason, Sloan, Akin & Robb, John A. Swain, Sutin, Thayer & Browne, Norman S. Thayer, Albuquerque, N.M., for defendants.

## MEMORANDUM OPINION

BURCIAGA, District Judge.

Plaintiffs bring claims under the Securities Act of 1933, 15 U.S.C. § 77q(a) *et seq.,* the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), Securities Exchange Commission Rule 10b–5, 17 C.F.R. § 240.10b–5, and the Securities Act of New Mexico, § 58–13–1 *et seq.* NMSA 1978, as well as a count for common law fraud. The case having come on for a trial to the bench on October 27, 28 and 29, 1986, the following will constitute the Court's findings of fact and conclusions of law. Due to the complex nature of the facts, they are set forth in paragraph form for the sake of clarity.

## FACTUAL BACKGROUND

1. Plaintiffs are husband and wife, residents of New Mexico, who over the years have invested in stocks, treasury bills, municipal bonds, and gold and silver.

2. According to Arthur B. Lyon, III, a stockbroker and Plaintiffs' account executive, Mr. Stone was an active investor in stocks and, although not a novice, was not extremely knowledgeable. Mr. Stone was in the habit of seeking investment advice from his personal friend and business acquaintance, James H. Foley ["Foley"], President and Chief Executive Officer of the First National Bank of Belen.

3. Prior to the Fossil Oil and Gas Company, Inc. ["Fossil"], purchase, Plaintiffs had never asked Foley's advice on investments other than on government bonds and securities which could be purchased through the First National Bank of Belen, Plaintiffs' depositor bank.

4. At the time of the transactions described herein, Foley was an owner of *registered* Fossil common stock purchased over the counter. The Fossil stock which Foley had previously purchased both personally and for Scientific Management, Inc., a corporation of which he was president and chairman of the board, was all registered, unrestricted and freely transferable.

5. At all times pertinent to this lawsuit, Fossil has been, and is now, a Delaware corporation with its office and principal place of business in Oklahoma City, Okla-

homa. Fossil has 100,000,000 shares of common stock authorized of which 33,508,-278 have been issued; the initial 6,000,000 shares of stock were sold in 1980 to the founders of Fossil and were not registered under either the federal or state securities laws.

6. From May, 1980, to June, 1984, Defendant Gaylan Adams ["Adams"] was president of Fossil and became its chairman of the board on June 6, 1984. Adams was one of Fossil's original directors. Defendants R.L. McPheron ["McPheron"] and W.J. Bryan ["Bryan"] have both been directors of Fossil from April, 1982, to the present.

7. Defendant EarLee Exploration Company ["EarLee"], an Oklahoma general partnership from 1980 to the present, has its office and principal place of business in Oklahoma City, Oklahoma. From its inception, Defendants McPheron and Bryan have been the only partners in EarLee.

8. On May 22, 1980, Fossil registered 6,000,000 shares of its common stock with the Securities and Exchange Commission ["SEC"]. These shares were sold over the counter at the price of $1.00 per share.

9. According to a letter of intent dated July 28, 1982, Fossil entered into an agreement with Aquila Corporation ["Aquila"] under which Fossil proposed to sell Aquila 10,000,000 shares of common stock with an option for an additional 10,000,000 shares of common stock at a price of fifty cents per share. However, Fossil was dissuaded from consummating the agreement because of derogatory information it received regarding the officers of Aquila. Fossil and Aquila therefore mutually agreed to terminate their agreement on August 5, 1982. Fossil additionally approached potential investors through a brokerage firm in 1982 but without success.

10. The Aquila agreement was replaced by a commitment from three directors of Fossil. Floyd Bergman ["Bergman"], chairman of the board of Fossil, agreed to purchase 4,000,000 shares of common stock for $2,000,000 cash. EarLee, a partnership composed of Defendants McPheron and Bryan, who were also members of the Fos-

sil Board of Directors, agreed to purchase 2,000,000 shares of common stock for $1,000,000 cash.

11. To finance its purchase, EarLee borrowed $500,000 from the Liberty National Bank and Trust Company of Oklahoma City, pursuant to a short-term note due November 8, 1982. EarLee anticipated that it would borrow funds from a bank to meet its obligation to acquire the additional 1,000,000 shares from Fossil on August 31, 1982. EarLee did in fact pay for the first 1,000,000 shares of Fossil stock on August 10, 1982, and paid for the balance of the shares on August 31, 1982.

12. According to Ronald L. Tucker, Fossil vice president and secretary, there was an informal discussion at the sale of Fossil stock to EarLee to the effect that EarLee intended to resell some of the stock. Furthermore, it is clear that under paragraph 7 of the stock purchase agreement between Fossil and EarLee, dated August 5, 1982, EarLee contemplated selling the common stock purchased at the second closing to such persons as Fossil and EarLee agreed to be "accredited investors." This intention was known to Fossil and its board of directors at the time EarLee executed the stock purchase agreement with Fossil.[1]

13. In order to sell the second 1,000,000 shares of Fossil stock, EarLee, through McPheron, contacted 19 potential investors, including Foley, who was McPheron's cousin. By letter dated August 27, 1982, bearing the letterhead "R.L. McPheron, Oil and Gas Investments," and captioned "Fossil Oil and Gas, Inc.," McPheron wrote to Foley stating that McPheron, Bergman and Bryan, the founding stockholders and directors of Fossil, had recently purchased 6,000,000 shares of Fossil stock. They were offering one-half of the "recently acquired stock" to qualified investors, with the minimum acquisition of blocks of 300,-000 shares at $150,000 per block. The letter further stated that all of the stock "is registered" and subject to compliance with SEC Rule 144. Enclosed with the letter was a copy of Fossil's Annual Report for the year ended March 31, 1982, and a "10–Q" Quarterly Report for the quarter ended September 30, 1982.

14. According to his testimony, Foley had no knowledge about stocks or bonds in the technical sense, nor did he know about different types of stocks. Although he knew that "lettered"[2] stock meant "restricted," SEC Rule 144 meant nothing to him. Foley had never purchased any restricted stock, either individually or on behalf of any other legal entity. It was Foley's belief that McPheron's letter of August 27, 1982, was for the purpose of seeking prospective purchasers, although McPheron never directly asked Foley to solicit interested parties.

15. Although the letter of August 27, 1982, characterizes the stock being offered as "registered," Foley had no recollection of the specifics regarding how he learned that the stock was not registered but "lettered." He believes he acquired that knowledge in telephone conversations with McPheron following his receipt of the letter of August 27, 1982. Foley stated that it might have been sometime during a second telephone call following receipt of the letter when McPheron informed him that the stock being sold was restricted stock.

16. Foley does not recall what caused him to bring up the investment possibility in Fossil to Plaintiffs. He acknowledges sharing the August 27, 1982, letter from McPheron with Plaintiff[3] and communicating to Plaintiff his high regard for McPheron. According to Plaintiff, Foley mentioned that Foley's cousin, McPheron, had acquired an interest in Fossil and that a

1. At trial, McPheron was asked by Plaintiffs' counsel why EarLee committed to purchase 2,000,000 shares of Fossil stock and yet immediately sought purchasers for half of the stock at the same price. He curiously answered that although he thought Fossil was viable and had great expectations, he wanted to limit EarLee's exposure in the event the venture proved to be unsuccessful.

2. "Lettered stock" is stock not registered under the Securities Act of 1933, where the buyer gives the seller a letter stating the buyer intends to hold the stock for investment purposes and does not contemplate reoffering the stock to others. Black's Law Dictionary 815 (5th ed. 1979).

3. Where the Court refers to "Plaintiff" in the singular, the Court is referring to Mr. Stone.

large block of stock was for sale. Plaintiff believed that the stock was a good investment and that payment of a commission was not involved.

17. During the discussion, Foley believes he informed Plaintiff that the Fossil stock being offered was "lettered." Foley, however, never said that the stock was restricted. Plaintiff admits that Foley may have said that the stock was "lettered," but Plaintiff believed this to merely mean that no commission was required to be paid.

18. On September 14, 1982, McPheron, under the letterhead of EarLee Exploration Company, sent a letter directly to Mr. Stone which purported to acknowledge Stone's desire to purchase 300,000 shares of Fossil Oil for fifty cents per share, although Stone did not affirmatively indicate such desire until he sent his check for the stock purchase on November 5, 1982. With the letter was a commitment form which the Stones were requested to complete. Of note is the following paragraph:

I will be purchasing the Shares for my own account, for investment and not for resale. I understand that the Shares may not be sold, pledged or otherwise disposed of by me unless there shall be a registration statement filed under all applicable securities laws or unless Fossil so approves and that an appropriate stop order and legend will reflect such restrictions.

19. Plaintiff had not told anyone he wanted to buy any Fossil stock and was surprised when he received the letter from McPheron. After reading the enclosed letter requesting his signature and evidencing his commitment to purchase stock, he threw it away.

20. According to Foley, he and Plaintiff discussed the possibility of purchasing Fossil stock no more than three or four times; the conversations were always casual. Up until the time of trial, Foley had never seen the "commitment letter" dated September 14, 1982, forwarded to Plaintiffs for signature, and they never discussed the "commitment letter." Prior to his purchase of

the Fossil stock, Plaintiff never talked with anyone from either Fossil or EarLee.

21. Plaintiff did not authorize Foley to buy the stock until November 5, 1982.[4] The $150,000 check drawn on Plaintiff's account, on November 5, 1982, was deposited to EarLee's account at the Liberty National Bank and Trust, Oklahoma City, Oklahoma, on November 15, 1982. On December 6, 1982, EarLee sent its check in the sum of $150,000, made payable to Liberty National Bank and Trust with instructions that the amount be applied as a principal reduction of EarLee's note No. 30950 made by EarLee for the acquisition of Fossil stock.

22. At all times, Plaintiff believed he was purchasing the Fossil stock from Fossil and not from EarLee. He was therefore surprised to learn subsequently that the cashier's check, dated November 5, 1982, was made payable to EarLee. McPheron admitted that he never told Foley or Stone that he was not representing Fossil or that he only was representing EarLee. In fact, a letter from McPheron to Foley and Stone, dated November 29, 1983, regarding a report on Fossil and its undertakings, is on McPheron's letterhead and is signed by McPheron although it deals exclusively with Fossil.

23. By letter dated December 6, 1982, (*after* receipt of Stone's check) EarLee forwarded to Foley a four-page investment letter requesting Plaintiffs' signature. Crowe and Dunlevy, attorneys for Fossil, had requested that Plaintiffs execute certain documents before the attorneys would authorize the transfer of the Fossil stock. The letter detailed the restrictions upon the Fossil stock and requested information regarding the suitability of Plaintiffs as purchasers. Foley forwarded the letter to Plaintiffs. The agreement was to be signed by Plaintiffs and forwarded to both Fossil and EarLee.

24. Upon receipt of the investment letter dated December 6, 1982, Plaintiff called Foley to express his dissatisfaction and in-

---

**4.** This date appears to have no particular significance. Plaintiff always had approximately one-half million dollars in various checking accounts which he could use for desired stock purchases.

structed Foley not to go through with the purchase because of the restrictions set forth in the agreement. Had Plaintiffs received the investment letter before November 5, 1982, when the check was sent, they would not have been willing to purchase the stock. In accordance with Plaintiff's request, Foley placed a telephone call to McPheron and conveyed Plaintiff's displeasure. Following the telephone conversation with McPheron, Foley was left with the impression that "it would be worked out."

25. By letter dated December 21, 1982, McPheron expressed his concern to Foley regarding Plaintiffs' dissatisfaction. Foley showed this letter to Plaintiffs and informed them that McPheron wanted to travel to Belen, New Mexico, to meet with them. McPheron and Bryan traveled to Belen, New Mexico, and met with Mr. Stone on January 12, 1983. At that meeting, Plaintiff informed McPheron and Bryan that he would not accept restricted stock. They, however, informed Plaintiff that they were about to register some stock and that Plaintiff's stock would be "piggybacked" with the other stock but that it would take a few weeks. Plaintiff indicated this was satisfactory to him.

26. At no time during this meeting did Bryan or McPheron request that Plaintiff sign the commitment letter previously requested. According to the testimony of Adams, McPheron informed him that Plaintiffs had signed the commitment letter. In fact, Plaintiffs maintained they had never forwarded any signed commitment letter to McPheron or any other representative of Fossil or EarLee and Defendants were unable to locate and produce any commitment letter signed by Plaintiffs. It appears that Plaintiffs never executed any documents requested by Fossil's counsel prior to the issuance of the restricted stock certificate.

27. It was Foley's understanding that following the meeting of Stone, Bryan and McPheron, whatever complaints Plaintiffs had would be remedied. He believed that Plaintiffs' stock would be "piggybacked" within a short period of time and that no further problem remained to be resolved.

28. At McPheron's request, Foley confirmed by letter of March 1, 1983, that Plaintiffs had a net worth of at least $750,000. Plaintiffs did not learn of this letter until after the lawsuit was filed.

29. After considerable time had passed, Plaintiff began to request that Foley "push" McPheron to get his stock registered and to deliver his stock certificate. By March, according to Foley, Plaintiff was at the end of his rope because nothing had come to pass.

30. It was not until mid-May of 1983, that Adams appeared in Belen, New Mexico, for the purpose of hand-delivering the stock certificate to Plaintiffs. Adams stated that the reason for the personal delivery was his embarrassment over the delay in the delivery of the stock certificate. The issue date on the stock certificate was May 5, 1983.

31. At this meeting, Adams assured Plaintiffs that the stock certificate was not what they had agreed upon but that so much time had elapsed that he wanted Plaintiffs to have "something". Adams promised that Plaintiffs would either receive their registered stock or their money back. Adams presented Plaintiffs with stock certificate No. OCU14371 for 300,000 shares bearing the following restriction:

A "stop transfer" has been placed against the shares represented by this certificate due to the restrictive language shown on the reverse side hereof.

On the reverse side of the stock certificate appears the following language:

The shares represented by this certificate have not been registered under the Securities Act of 1933. The shares have been acquired for investment and may not be sold, transferred, pledged or hypothecated in the absence of an effective registration statement for the shares under the Securities Act of 1933, compliance with "Rule 144" under such Act, or an opinion of counsel, satisfactory to the corporation, that registration is not required under said Act.

32. After delivery of the stock certificate, Stone signed a "receipt for securities" which stated simply, "Received the securi-

ties described below in correct form." Adams then departed. Although Adams testified that he did not know that Plaintiffs had demanded registered stock before their Belen meeting, other evidence in the record disputes this contention.

33. On June 3, 1983, Adams sent a letter to Mr. and Mrs. Stone regarding the transferability of their shares. He advised the Stones that the board of directors of Fossil had approved a resolution agreeing to register the stock for sale as part of the same registration statement covering the registration of common stock for sale to the public by Fossil.

34. Plaintiff eventually asked Foley whether he was making any effort to assure that McPheron complied with his promises to register Plaintiff's stock. Foley reported that McPheron was not returning his phone calls. On April 11, 1984, Plaintiff wrote a letter to Adams. In the letter, Plaintiff expressed his concern that he had not received his registered stock as had been promised at the Belen meeting. He therefore demanded return of his purchase price of $150,000 plus interest thereon at 9%, with a stipulation that the stock certificate in Plaintiff's possession would be forwarded to Fossil upon receipt of their check.

35. At the direction of Adams, Fossil's attorneys, Crowe and Dunlevy, responded to the letter of April 11, 1984, on May 11, 1984. The attorneys asserted that Plaintiffs were well aware that they were purchasing restricted stock and, in support thereof, attached a copy of a commitment letter the attorneys contended was signed by Plaintiffs. Although the letter was signed, the signature was not that of Plaintiffs. Counsel for Fossil also asserted that Fossil and EarLee had fully performed their agreement and, therefore, Fossil refused the request for return of the purchase price of $150,000 plus interest.

### THEORIES OF RECOVERY

Plaintiffs assert claims under the Securities Act of 1933, specifically 15 U.S.C. § 77*l*(1) and (2), also known as §§ 12(1) and 12(2) respectively. Section 12(1) prohibits offers and sales of unregistered securities unless properly exempted. Plaintiffs claim that the securities sold to them were not properly registered nor were they exempt from the Act's registration requirements. Plaintiffs further invoke § 12(2), seeking to impose liability on Defendants for making untrue statements in the offer or sale of the Fossil securities. Plaintiffs also seek relief under the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) and Rule 10b–5, codified at 17 C.F.R. § 240.10b–5. This claim, based on misrepresentation in the sale of a security, basically seeks recovery for the same misstatements relevant to Plaintiffs' claim under § 12(2). Plaintiffs claim that Defendants initially represented that the stock offered for sale was registered, and that this statement was untrue. Plaintiffs assert that a second misrepresentation occurred following their acquisition of unregistered Fossil stock; namely, that Defendants promised to register Plaintiffs' stock. Plaintiffs also assert two pendent state claims, one under the New Mexico Securities Act based on the misrepresentations made by Defendants in the offer and sale of the Fossil stock, and the second grounded in common law fraud.

The Court will first consider whether any of Plaintiffs' claims are barred by the statute of limitations; second, which of the Defendants can be held liable under the theories asserted, and lastly, whether Plaintiffs are entitled to recover under those theories.

### STATUTE OF LIMITATIONS

#### 1933 Act

Defendants urge this Court to find that Plaintiff's 1933 Act claims are barred by the applicable statute of limitations, 15 U.S.C. § 77m, commonly referred to as § 13. Section 13 provides:

No action shall be maintained to enforce any liability created under section 11 or section 12(2) unless brought within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence, or, if the action is to enforce a liability created under section 12(1), unless brought within one year after the viola-

tion upon which it is based. In no event shall any such action be brought to enforce a liability created under section 11 or section 12(1) more than three years after the security was bona fide offered to the public, or under section 12(2) more than three years after the sale.

Plaintiff filed this action on November 5, 1984. The statute would have begun to run, unless tolled, at the time of the sale of unregistered securities to Plaintiff, for purposes of § 12(1). For § 12(2) liability, the statute began to run (1) at the time Plaintiff should have discovered the misrepresentation with respect to the offer, which was presumably at the time of sale; and, (2) with respect to the misrepresentation in connection with the actual sale, at some reasonable time thereafter, when it should have become apparent to Plaintiff that his stock would not be registered.

█ Central to the statute of limitations analysis, therefore, is the date on which the "sale" of securities to Plaintiff took place. Although Defendants urge that the date of sale was November 5, 1982, the Court finds that the check sent on that date by Plaintiff to EarLee in response to EarLee's solicitation of buyers for Fossil stock constituted an offer by Plaintiff to purchase stock. On that date, the sale was not consummated for purposes of the statute of limitations. Although Plaintiff authorized that payment be made on this date, it is clear that Plaintiff's offer to purchase was subject to certain conditions. Defendants testified regarding their need to secure data regarding Mr. Stone's financial condition before he could become an authorized purchaser of the unregistered securities which were the subject of the offering. The parties continued to differ over the type of stock being sold and there remained a tentative, unfinished quality to the transaction. It was not until Mr. Stone agreed to take delivery of unregistered stock that the sale of stock was finally realized. Thus, not until May 5, 1983, when specific stock certificates were issued to Plaintiff, did an actual sale of securities take place.

Other courts have interpreted the term "sale" as used in securities acts in a liberal manner consistent with the underlying purpose of the Acts, which is one of protecting the public from irregular or fraudulent securities transactions. In *Ambling v. Blackstone Cattle Co., Inc.*, 650 F.Supp. 170 (N.D.Ill.1987), the court determined that the date of sale for purposes of § 13 was not the date plaintiffs parted with their final payment for a limited partnership interest, but was the date that they actually received the interest for which they paid. In determining whether a transaction is barred by the statute of limitations, the court was willing to look to "all parts of a sales transaction, from offer to title transfer." This Court likewise decides that the term "sale" should be liberally construed to effectuate the goal of protecting investors. *Associated Securities Corp. v. SEC*, 293 F.2d 738, 740 (10th Cir. 1961); *SEC v. Blinder Robinson & Co., Inc.*, 511 F.Supp. 799, 801 (D.Colo.1981), *aff'd*, 748 F.2d 1415 (10th Cir.1984), *cert. denied*, 471 U.S. 1125, 105 S.Ct. 2655, 86 L.Ed.2d 272 (1985).

The date of sale, May 5, 1983, is more than one year prior to the filing of Plaintiff's Complaint. Unless the Court finds that equitable tolling of the statute is warranted, Plaintiffs' 1933 Act claims will be time-barred. The statute requires that Plaintiff's claims under § 12(1) and § 12(2) be considered separately.

██ An action to enforce liability under § 12(1) must be brought "within one year after the violation upon which it is based" but "in no event" shall such action be brought "more than three years after the security was *bona fide* offered to the public." The Court finds that the one and three years limitations periods are not meant to be read alternatively, but cumulatively. In order to literally fall within the limitations period, Plaintiffs' § 12(1) action must have been filed both within one year of the violation *and* within three years after the securities were initially *bona fide* offered to the public. *See LeCroy v. Dean Witter Reynolds, Inc.*, 585 F.Supp. 753, 760 (E.D.Ark.1984). The three-year bar has been interpreted as being absolute. *See, e.g., SEC v. Seaboard Corp.*, 677 F.2d 1301, 1308 (9th Cir.1982); *LeCroy*, 585 F.Supp. at 759 n. 3. It is a matter of some

debate whether the one-year period is absolute or whether that period is subject to equitable tolling. Under federal common law, a statute may be equitably tolled where a plaintiff remains ignorant of facts or information that, through no fault or want of diligence on plaintiff's part, would form the basis of a cause of action. *See State of Ohio v. Peterson, Lowry, Rall, Barber & Ross,* 651 F.2d 687, 692 (10th Cir.), *cert. denied,* 454 U.S. 895, 102 S.Ct. 392, 70 L.Ed.2d 209 (1981); *Houlihan v. Anderson & Stokes, Inc.,* 434 F.Supp. 1319, 1322–23 (D.D.C.1977). There is authority for the proposition that the one-year bar for § 12(1) was intended to be absolute, *i.e.,* not subject to the discovery rule or equitable tolling. *See Cook v. Avien, Inc.,* 573 F.2d 685, 691 (1st Cir. 1978). *Felts v. National Account of Systems Association, Inc.,* 469 F.Supp. 54, 64 (N.D.Miss.1978). Nevertheless, some courts have held that equitable tolling should apply to actions under § 12(1) where a plaintiff has been given post-sale information that misled the plaintiff into believing that a technical violation did not occur or that plaintiff would be given an extension of time in which to file suit. *Id.* at 758–59; *Houlihan,* 434 F.Supp. at 1322–23. Other courts reason that the fraudulent concealment doctrine should be read into *any* federal statute of limitations. *See In re National Mortgage Equity Corp. Mortgage Pool Certificates Securities Litigation,* 636 F.Supp. 1138, 1167 (C.D.Cal.1986), citing *Holmberg v. Armbrecht,* 327 U.S. 392, 397, 66 S.Ct. 582, 585, 90 L.Ed. 743 (1946).

As applied to § 12(2) claims, § 13 expressly provides that the one-year period does not begin to run until Plaintiff discovered or should have discovered the fraud. Had Congress intended to apply a similar standard to § 12(1) claims, it could have done so. The logical inference is that by omitting a "discovery" rule for § 12(1) claims, Congress intended to prohibit application of such a rule to this class of claims, in direct contrast to its decision to allow tolling until discovery in § 12(2) claims. *See McCullough v. Leede Oil & Gas, Inc.,* 617 F.Supp. 384, 387 (W.D.Okla.1985). In contrast to the fraudulent conduct punishable under § 12(2), § 12(1) imposes a form of strict liability for technical or procedural infirmities in complying with the registration requirements. *See LeCroy,* 585 F.Supp. at 759. Thus, as observed by the *McCullough* court:

> [T]here is little justification for application of the discovery rule outside the fraud-based causes of action. The discovery rule, or any equitable tolling on the basis of fraudulent concealment, is premised on a fraudfeasor's ability to conceal his violations. However, a seller of securities cannot conceal the fact that the securities he sells are not registered. While he may misrepresent that the securities are properly registered, or that registration is not required, he cannot prevent a purchaser from discovering the true facts as to a lack of registration. Thus, the discovery rule has little justification in the nonregistration setting.

*McCullough,* 617 F.Supp. at 387.

This Court agrees that the statute of limitations governing Plaintiff's claims under § 12(1) is not subject to equitable tolling.

■ Plaintiff's claims under § 12(2) fare somewhat better, however, given the more liberal application of the limitations period expressly authorized by the statute. Plaintiff must bring his action "within one year after the discovery of the untrue statement ... or after such discovery should have been made by the exercise of reasonable diligence." Defendants' liability under § 12(2) is based on material misrepresentations in the offer and sale of securities. Defendants fraudulently misrepresented that (1) the stock being offered was registered and (2) that the stock would subsequently be registered. While Plaintiff did discover that the stock was not registered, Plaintiff did not reasonably discover that Defendants' assurance that the stock would be registered was a misstatement until May 11, 1984, when, by letter from their attorneys, Crowe and Dunlevy, Fossil asserted that Plaintiffs' agreement with Fossil and EarLee had been fully performed and Defendants would not refund Plaintiffs' money. Since Plaintiffs' Com-

plaint was filed within a year of that date, it was timely under § 13. Plaintiffs' failure to discover Defendants' misrepresentation prior to that time was excusable, as Mr. Stone was not a sophisticated investor, and he had no reason to suspect that Defendants, despite their assurances, did not intend to register his stock.

### 1934 Act

Rule 10b–5 provides liability for fraud in the sale of a security. The Court determined the date of the sale to be May 5, 1983. As there is no federal statute of limitations applicable to private actions under Rule 10b–5, the limitations period is supplied by the law of the forum state. *State of Ohio*, 651 F.2d at 691. Even if this Court applies the most restrictive period possible, the two-year statute of limitations borrowed from § 58–13–42 A NMSA 1978, the New Mexico Securities Act, Plaintiff's action was filed within two years from the date of sale and would not, therefore, be time-barred.[5]

### SECONDARY LIABILITY UNDER THE 1933 ACT

 Under § 12, a purchaser of securities may only recover from his immediate seller; however, the definition of "seller" has been the subject of some interpretation. *Hill York Corp. v. American International Franchises, Inc.*, 448 F.2d 680 (5th Cir.1971). Clearly, EarLee is liable to Plaintiff under this section; more problematic, however, is whether Fossil may also be held liable under any existing theory of secondary liability. The Tenth Circuit has never passed on the issue of whether "aider and abettor" liability will suffice to bring a defendant within the "seller" definition of § 12, and there exists a split of authority among other courts on this issue. In *In re Home-Stake Production Co. Securities*, 76 F.R.D. 337 (N.D.Okla.1975), the district court declined to limit § 12 liability to the direct seller, finding instead that

"significant participation in the sale of securities may be sufficient for a § 12(2) liability." 76 F.R.D. at 349. *See also Woods v. Homes & Structures of Pittsburg, Kansas, Inc.*, 489 F.Supp. 1270, 1294 (D.Kan.1980). "The test applied ... requires more than mere participation but less than strict privity; if the acts of the defendant are a proximate cause of the sale of these securities, the defendant meets the seller requirement of § 12. Such a test encompasses aiders and abettors."

The Court believes the better-reasoned approach to be that those who significantly participate in a sale are liable under § 12 to the same extent as the person who actually passes title. In fact, many of the misrepresentations charged under § 12(2) were made by Fossil, not EarLee. Plaintiff originally thought that he was dealing with Fossil directly. Letters to Plaintiff carried the letterheads of both Fossil and EarLee. The stock certificates were hand-delivered to Plaintiff by Defendant Adams, President of Fossil, and it was Adams who made the false representations to Plaintiff that Plaintiff's stock would eventually be registered. Thus, Fossil aided and abetted EarLee, the actual seller of the stock, who knew of the false representations and did nothing to apprise Plaintiff of the true situation. Both Fossil and EarLee are liable for the misrepresentations which were made in connection with the actual sale of the securities to Plaintiff.

### SECONDARY LIABILITY UNDER THE 1934 ACT

The standard for secondary liability under Rule 10b–5 is a lesser one than under § 12, since Rule 10b–5 liability does not require strict privity. *Cronin v. Midwestern Oklahoma Development Authority*, 619 F.2d 856 (10th Cir.1980). In *Cronin*, the court stated that participation and aider and abettor theories were viable grounds for imposition of liability under Rule 10b–5.

---

5. Section 58–13–42 A was amended to provide a four-year statute of limitations, effective 90 days after March 19, 1983. Even if some of Defendants' fraudulent acts occurred after the new limitations went into effect, Plaintiff's claims would not be time-barred. Alternatively, if this Court were to borrow the limitations period

contained in § 37–1–4 NMSA 1978, New Mexico's four-year statute of limitations for common-law fraud, *see Jones v. Ford Motor Co.*, 599 F.2d 394, 398 (10th Cir.1979), the four-year limitations period would not bar Plaintiff's 10b–5 claim.

*Id.* at 862. Thus, this Court's analysis with respect to Fossil's liability under § 12 is equally applicable under Rule 10b–5, and the Court finds that EarLee and Fossil are both liable to Plaintiff on Plaintiff's claims under the 1934 Act.[6]

**1933 ACT CLAIMS**

As previously determined, Plaintiffs' claims under § 12(1) are barred by the applicable statute of limitations. However, Plaintiff seeks to impose liability upon Defendants under § 12(2) of the 1933 Securities Act. Section 12(2) provides:

Sec. 12. Any person who—

\* \* \* \* \* \*

(2) offers or sells a security (whether or not exempted by the provisions of section 3, other than paragraph (2) of subsection (a) thereof), by the use of any means or instruments of transportation or communication in interstate commerce or of the mails, by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading (the purchaser not knowing of such untruth or omission), and who shall not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of such untruth or omission, shall be liable to the person purchasing such security from him, who may sue either at law or in equity in any court of competent jurisdiction, to recover the consideration paid for such security with interest thereon, less the amount of any income received thereon, upon the tender of such security, or for damages if he no longer owns the security.

The elements of Plaintiff's case under § 12(2) are as follows:

(1) The alleged misrepresentations or omissions must be material.

(2) The misrepresentations or omissions must be misleading.

(3) The buyer/Plaintiff must prove his excusable ignorance of the misrepresentations or omissions.

(4) Defendant/seller must be unable to prove that he did not know, and in the exercise of reasonable care could not have known, of the misrepresentations or omissions.

*Gilbert v. Nixon,* 429 F.2d 348, 355–57 (10th Cir.1970).

The court in *Gilbert* concluded, with respect to the materiality requirement, that:

an omission or misrepresentation of fact was material if, considering its full context, including the subject matter and the relationship of the parties, the misrepresentation or omission was of a fact which, considering appellants as reasonable or prudent investors, would affect or influence them in determining whether to buy the [stock].

429 F.2d at 356.

In the instant case, the Court's findings of fact indicate that the following misrepresentations or omissions occurred with respect to the offer and subsequent sale to Plaintiff of Fossil stock. First, in the August 27, 1982, letter from McPheron to Foley, which Foley later showed to Stone, McPheron stated that the stock to be offered was "registered," when in fact it was not. Testimony at trial indicated that Foley later learned, possibly through a telephone conversation with McPheron, that the stock to be offered was restricted. However, there is no evidence that he communicated this information to Plaintiff, other than to tell Plaintiff that the stock was "lettered." Plaintiff, a person of limited investment savvy, was unaware that "lettered" meant "restricted" stock; he believed this to merely mean that no commission was required to be paid. However, the commitment letter sent to Plaintiff on September 14, 1982, contained a paragraph which stated as follows:

I will be purchasing the Shares for my own account, for investment and not for

---

**6.** Frequently the Court in its discussion of the substantive claims to follow, will refer to Fossil, EarLee, Adams, McPheron and Bryan collectively as "Defendants." As all are liable under the aider and abettor principle, there is no need to differentiate among them for purposes of the overall analysis.

resale. I understand that the Shares may not be sold, pledged or otherwise disposed of by me unless there shall be a registration statement filed under all applicable securities laws or unless Fossil so approves and that an appropriate stop order and legend will reflect such restrictions.

Plaintiff received and read this letter, but he did not sign it and he later threw it away. On November 5, 1982, he directed Mr. Foley to issue a $150,000 cashier's check for the purchase of 300,000 shares of Fossil stock. This check was deposited to EarLee's account on November 15, 1982. On December 6, 1982, EarLee sent its check in the sum of $150,000, made payable to Liberty National Bank and Trust with instructions that the amount be applied as a principal reduction of EarLee's note No. 30950 made by EarLee for the acquisition of Fossil stock. EarLee knew, at that time, that Plaintiff had not signed the commitment letter, and that they had never communicated any further information to Plaintiff about the stock Plaintiff sought to purchase.

The misrepresentation alleged here, for purposes of § 12(2) liability in respect to an offer of a security, is Defendants' representation to Plaintiff that the stock in question was *registered* under the 1933 Act. Plaintiff had no knowledge of the technical meaning of the term "lettered" stock. Nor did he sign the commitment letter to purchase "restricted" stock, or treat it as though it applied to him, as evidenced by his testimony that he threw the letter away. The evidence in the record supports a finding that, at the time Plaintiff sent in his money, he (1) believed he was purchasing stock from Fossil, not EarLee, and (2) he believed he was purchasing registered stock. The Court finds that Plaintiff met his burden at trial of proving excusable ignorance of the fact that what Defendants sought to sell was unregistered Fossil stock through EarLee. Defendants have not met their burden of proving that they did not know of that untruth or misrepresentation. Clearly they knew that the stock offered in the August 27, 1982, letter was stated to be registered, and they never communicated otherwise to Plaintiff. Also,

they knew that Plaintiff had never signed the September 14, 1982, commitment letter; Plaintiff testified that the signature on the letter which purportedly was his was, in fact, a forgery. Therefore, Defendants are liable to Plaintiff under § 12(2) for fraud in offering Plaintiff a security, the nature of which was misrepresented to Plaintiff as registered stock, when in fact it was not so registered.

Second, Defendants are further liable to Plaintiff for § 12(2) fraud in the *sale* of a security. At the time of the actual sale, May 5, 1983, when stock certificates were issued to Plaintiff, Plaintiff knew that the stock he then was purchasing was unregistered. However, Defendants fraudulently misrepresented to Plaintiff, at that meeting, that Plaintiff's stock would be registered, or Plaintiff would receive his money back. At that time, Defendants did not intend to register, and never did register Plaintiff's stock. Plaintiff had no reason to know Defendants' representations at that time were false, nor can Defendants claim ignorance of the fact that a misrepresentation was made. Thus, Defendants' actions with regard to the actual sale of unregistered stock constituted a material oral misrepresentation subjecting them to liability under § 12(2).

## 1934 ACT CLAIMS

Plaintiffs seek recovery under § 10(b) and Rule 10b–5 of the 1934 Securities Exchange Act. Rule 10b–5 provides:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange,

(1) to employ any device, scheme or artifice to defraud,

(2) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(3) to engage in any act, practice, or course of business which operates or

would operate as a fraud or deceit upon any person,

in connection with the purchase or sale of any security.

Rule 10b–5 does not expressly grant a private right of action, but such an implied cause of action has been recognized in every circuit which has considered the issue, including the Tenth Circuit. *Mitchell v. Texas Gulf Sulphur Co.*, 446 F.2d 90, 96 (10th Cir.), *cert. denied*, 404 U.S. 1004, 92 S.Ct. 564, 30 L.Ed.2d 558 (1971).

■ The elements of Plaintiff's cause of action under 10b–5 are similar to his case under § 12(2), with two major differences: (1) under 10b–5, Plaintiff must prove actual *reliance* upon a misrepresentation made by Defendant, and (2) Plaintiff must prove scienter, *i.e.*, Defendant possessed a mental state embracing intent to deceive, manipulate, or defraud. *Id.* at 102; *Loveridge v. Dreagoux*, 678 F.2d 870, 875 (10th Cir. 1982).

■ With respect to the reliance element of Plaintiff's case, Plaintiff must prove not only that Defendants' misrepresentation was material, but that he actually relied on it in purchasing the stock. The Court has already discussed the materiality requirement, and found it to be satisfied in connection with § 12(2) liability. With respect to *actual* reliance, according to Plaintiff's testimony at trial, he would not have accepted the unregistered stock in May, 1983, but for his belief in Defendant's representations that the stock would be "piggybacked" on Defendants' next registered offering. The Court finds that Defendants' statements were a substantial factor in inducing Plaintiff to buy stock which he would not otherwise have purchased, and Plaintiff relied on the supposed truth of those statements, in making that purchase. Therefore, the reliance requirement under Rule 10b–5 is satisfied.

With respect to the scienter element of Plaintiff's claim, the Tenth Circuit has applied a standard whereby Defendants' knowledge of falsity or reckless disregard for truth or falsity of the alleged misrepre-

sentation, will fulfill the scienter requirement. *See Loveridge*, 678 F.2d at 875–76. In this case, Defendants represented to Plaintiff that his stock was to be "piggybacked" onto their next registration. Yet, Plaintiffs subsequently received a letter from Fossil's attorneys, Crowe & Dunlevy, dated May 11, 1984, in which the attorneys asserted that Plaintiffs were well aware that they were purchasing restricted stock at the time of sale and that, therefore, Fossil had fully performed its agreement and refused Plaintiff's request for return of the purchase price of the stock. The Court finds from the evidence that Defendants had no intention of registering Plaintiff's stock, and Defendant Adams knew that his representation to that effect was false at the time he made the statements to Plaintiff in May of 1983. Thus, the scienter element of Rule 10b–5 is satisfied. The Court concludes that Plaintiff has proved his 1934 Act claim and is entitled to recovery under Rule 10b–5.

## THE NEW MEXICO SECURITIES ACT

■ Plaintiff additionally seeks recovery under the New Mexico Securities Act, § 58–13–39 NMSA 1978, and § 58–13–42 NMSA (1983 Supp.).[7] The New Mexico prohibition against fraudulent practices is practically identical to the federal Rule 10b–5. NMSA § 58–13–39(A) provides:

It is a fraudulent practice and unlawful for any person, in connection with an offer, sale or purchase of any security, directly or indirectly, to:

(1) employ any device, scheme or artifice to defraud;

(2) make any false statement of material fact or to omit to state a material fact necessary in order to make the statements made true in the light of circumstances under which they are made; or

(3) engage in any act, practice or course of business which operates, or would operate, as a fraud or deceit upon any person.

---

7. The Court notes that this Act has now been superseded by the New Mexico Securities Act of 1986, § 58–13B–1 *et seq.* NMSA (Repl.Pamp. 1986), effective July 1, 1986. This case, filed prior to that time, is decided under the old law.

Section 58–13–42, the remedy provision of the statute, provides that every sale or contract for sale made in violation of the New Mexico Securities Act is voidable at the purchaser's election. This section, amended March 19, 1983, provides for a four-year statute of limitations period; the previous statute of limitations was two years.

No reported New Mexico case law has set forth the elements of a cause of action under § 58–13–39. Because of the similarity of this statute to the federal law, the Court will apply the same analysis to the state statute as to the federal cause of action. The Court concludes that Defendants violated the New Mexico Securities Act in making a false statement to Plaintiff in connection with the May, 1983 sale of securities, and that Plaintiff is thus entitled to relief in accordance with the remedy provided in § 58–13–42.

## COMMON LAW FRAUD

■ Plaintiff additionally seeks to hold Defendants liable under a pendent state cause of action for common law fraud. In New Mexico, the elements of a fraud claim are as follows:

> The essential elements required to sustain an action for fraud, are that a representation was made as a statement of fact which was untrue and known to be untrue by the party making it, or else recklessly made; that it was made with intent to deceive and for the purpose of inducing the other party to act upon it; and that the other party did in fact rely on it and was induced thereby to act to his injury or damage.

*Prudential Insurance Co. of America v. Anaya*, 78 N.M. 101, 104, 428 P.2d 640 (1967); *Sauter v. St. Michael's College*, 70 N.M. 380, 374 P.2d 134 (1962).

These elements are quite similar to the requirements for a cause of action under Rule 10b–5, discussed *supra*. The knowledge of falsity and intent to deceive elements may be equated with the "scienter" requirement of the Rule, already held by the Court to have been satisfied. Similarly, the Court found in its discussion of Rule 10b–5 that Plaintiff had relied upon Defendants' misstatements that the stock would be registered, in making his purchase. The Court holds that Plaintiff has proved his claim for common law fraud under New Mexico law by clear and convincing evidence.

## RELIEF

■ The Court finds that Plaintiffs have proved that they are entitled to their requested relief of rescission of the sale and recovery of the purchase price, $150,-000, plus interest, attorney's fees and costs. As the contract is rescinded, Plaintiffs are obliged to disgorge any benefit they received from the transaction and thus must tender the stock certificate to Defendants. Plaintiffs also requested punitive damages under their theory of common law fraud. Under New Mexico law, punitive damages may be awarded "only where the conduct of the wrongdoer may be said to be maliciously intentional, fraudulent, oppressive, or committed recklessly or with a wanton disregard for the plaintiff's rights." *Loucks v. Albuquerque National Bank*, 76 N.M. 735, 747, 418 P.2d 191 (1966); *see also Wirth v. Commercial Resources, Inc.*, 96 N.M. 340, 630 P.2d 292 (Ct.App.1981). The Court has some question as to whether under New Mexico law punitive damages may be awarded where a rescission remedy is the only relief granted and no special or consequential damages have been proved. *Cf. Robison v. Katz*, 94 N.M. 314, 321–22, 610 P.2d 201 (Ct.App.), *cert. denied*, 94 N.M. 675, 615 P.2d 992 (1980); *Grandi v. LeSage*, 74 N.M. 799, 810, 399 P.2d 285 (1965); *see generally* D. Dobbs, *Law of Remedies* 211–12 (1973). Nevertheless, whether they may be awarded or not, the Court finds that punitive damages are not warranted in this case. While the facts support a finding for Plaintiffs on their fraud claim, the surrounding circumstances are not sufficiently egregious to support an award of punitive damages. Based on all the facts and circumstances, the Court finds that Plaintiffs are not entitled to punitive damages.

A judgment will be entered accordingly.